901 F.2d 311
 Terri Lee HALDERMAN, a retarded citizen, by her mother and
guardian, Winifred HALDERMAN; Larry Taylor, a retarded
citizen, by his parents and guardians, Elmer and Doris
Taylor; Kenny Taylor, a minor, a retarded citizen, by his
parents and guardians, Elmer and Doris Taylor; Robert
Sobetsky, a minor, a retarded citizen, by his parents and
guardians, Frank and Angela Sobetsky; Theresa Sobetsky, a
retarded citizen, by her parents and guardians, Frank and
Angela Sobetsky; Nancy Beth Nowman, a retarded citizen, by
her parents and guardians, Mr. and Ms. Horace Nowman; Linda
Taub, a retarded citizen, by her parents and guardians, Mr.
and Mrs. Allen Taub; George Sorotos, a minor, a retarded
citizen, by his foster parents, William and Marion Caranfa,
all of the above individually and on behalf of all others
similarly situated; the Parents and Family Association of
Pennhurst Pennsylvania Association for Retarded Citizen, Jo
Suzanne Moskowitz, a minor, by her parents and next friends,
Leonard and Nancy Moskowitz, Robert Hight, a minor, by his
parents and next friends, John and Jeanne Hight, David
Preusch, a minor by his parents and next friends, Calvin and
Elizabeth Preusch, and Charles DiNolfi, on behalf of
themselves and all others similarly situated, Plaintiffs-Intervenors,
United States of America, Plaintiff-Intervenor,
v.
PENNHURST STATE SCHOOL & HOSPITAL, Department of Public
Welfare of the Commonwealth of Pennsylvania, Frank S. Beal,
Secretary of the Department of Public Welfare, Stanley
Meyers, Deputy Secretary for Mental Retardation, Department
of Public Welfare, Helene Wohlgemuth, Former Secretary,
Department of Public Welfare, Aldo Colautti, Executive
Deputy Secretary, Department of Public Welfare, Wilbur
Hobbs, Deputy Secretary for Southeastern Region, Department
of Public Welfare, Russell Rice, Jr., Commissioner of Mental
Retardation for Southeastern Region, Department of Public
Welfare, C. Duane Youngberg, Superintendent, Pennhurst State
School & Hospital, Robert Smilovitz, Former Assistant
Superintendent, Pennhurst State School & Hospital, Joseph
Foster, Assistant Superintendent, Pennhurst State School &
Hospital, Margaret Green, Betty Uphold, Alice Barton, P.E.
Klick, Dr. Parocca, Helen Francis, employees and agent of
Pennhurst State School & Hospital, John Doctor, James Nurse,
Jane Aide, Jill Therapist, Richard Roe, Jane Doe, unknown
and unnamed staff, employees and agents of Pennhurst State
School & Hospital, each individual Defendant sued
individually and in his or her official capacity, George
Hetzger, Joseph Catania, and Roger Bowers, Commissioners for
Bucks County, Robert Strebl, Earl Baker and Leo McDermott,
Commissioners for Chester County, Faith R. Whittlesey,
Charles Keller, and William Spingler, Commissioners for
Delaware County, A. Russell Parkhouse, Frank W. Jenkins and
Lawrence H. Curry, Commissioners for Montgomery County,
Mayor Frank L. Rizzo and The City of Philadelphia, as
Authorities for Philadelphia County, Peter Bodenheimber,
Mental Health/Mental Retardation Administration for Bucks
County, William A. McKendry, Mental Health/Mental
Retardation Administrator for Chester County, P. Paul
Burrichter, Mental Health/Mental Retardation Administration
for Delaware County, Herman A. Roether, Mental Health/Mental
Retardation Administration for Montgomery County and Leon
Soffer, Mental Health/Mental Retardation Administrator for
Philadelphia County.
Appeal of PENNHURST STATE SCHOOL AND HOSPITAL, the
Department of Public Welfare, Secretary of Public Welfare,
the Deputy Secretary of Mental Retardation, the Executive
Deputy Secretary of Public Welfare, the Deputy Secretary for
Southeast Region, the Commissioner for Mental Retardation
for Southeast Region, the Superintendent for Pennhurst State
School and Hospital and the Employees and Agents for
Pennhurst State School and Hospital, Appellants No. 89-1788.
Appeal of COMMISSIONERS AND MENTAL HEALTH/MENTAL RETARDATION
ADMINISTRATOR of Montgomery County, Pennsylvania,
Appellants No. 89-1841.
Appeal of The MENTAL HEALTH/MENTAL RETARDATION
ADMINISTRATION and County Council of Delaware
County, Pennsylvania, Appellants No. 89-1842.
 Nos. 89-1788, 89-1841 and 89-1842.
 United States Court of Appeals,
Third Circuit.
 Argued March 1, 1990.
Decided April 17, 1990.
 
 John A. Kane, Chief Counsel, Howard Ulan (argued), Asst. Counsel, Dept. of Public Welfare, Com. of Pa., Office of Legal Counsel, Harrisburg, Pa., for appellants No. 89-1788, Pennhurst State School and Hosp., the Dept. of Public Welfare, Secretary of Public Welfare, the Deputy Secretary of Mental Retardation, the Executive Deputy of Public Welfare, the Deputy Secretary for Southeast Region, the Com'r for Mental Retardation for Southeast Region, the Superintendent for Pennhurst State School and Hosp. and the employees and agents of Pennhurst State School and Hosp.
 R. Stephen Barrett (argued), Solicitor's Office, Norristown, Pa. for appellants No. 89-1841, Com'rs and Mental Health/Mental Retardation Adm'r of Montgomery County, Pa.
 Thomas M. Kittredge (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants No. 89-1842, the Mental Health/Mental Retardation Adm'n and County Council of Delaware County, Pa.
 David Ferleger (argued), Philadelphia, Pa., for appellees, Terri Lee Halderman, et al.
 Judith A. Gran (argued), Public Interest Law Center of Philadelphia, Philadelphia, Pa., for appellees, Ass'n for Retarded Citizens/Pa., et al.
 Before HUTCHINSON and COWEN, Circuit Judges, and LECHNER, District Judge*.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 Today we revisit the seemingly endless litigation over the closing of Pennhurst State School and Hospital ("Pennhurst"). In March 1989, the Association of Retarded Citizens/Pennsylvania ("ARC/PA") moved the district court for enforcement of a settlement agreement entered into by all the parties to this litigation six years ago which supposedly ended their dispute. After holding evidentiary hearings on the motion, the district court entered an order finding the various state defendants in this action (whom we will refer to collectively as "the Commonwealth"), the Montgomery County defendants ("Montgomery County"), and the Delaware County defendants ("Delaware County") in substantial noncompliance with the agreement and its court order incorporating the agreement. The Commonwealth and the two Counties now appeal the district court's order, as well as the denial of their motions to dismiss due to the court's lack of subject matter jurisdiction. Because we find that the district court had subject matter jurisdiction and did not err in finding the Commonwealth and the Counties in substantial noncompliance, we will affirm.I.
 
 BACKGROUND
 
 2
 The Pennhurst case has a long and complex procedural history.[1] It suffices for our purposes to note that the original complaint was filed in 1974 as a class action by Terri Lee Halderman against the Commonwealth, Delaware County, Montgomery County, and various officials of three other counties.[2] The ARC/PA intervened as a party plaintiff in 1975.[3] The case was actively litigated for eleven years, producing 28 published opinions and three arguments before the United States Supreme Court.
 
 
 3
 Ultimately, all parties conceded that Pennhurst was not providing adequate care and habilitation to its retarded residents. On July 12, 1984, under the guidance of Judge Rosenn of this Court, the parties reached a settlement. In approving the settlement agreement--titled and referred to by the parties as the Final Settlement Agreement ("FSA")--the district court explained that:
 
 
 4
 the Commonwealth and County defendants have agreed to provide community living arrangements to those members of the plaintiff class for whom such placement is deemed appropriate by the individual planning process, together with such community services as are necessary to provide each person with minimally adequate habilitation, until such time as the retarded individual no longer is in need of such living arrangements and/or community services. The defendants agree to provide residential and habilitative services to all persons who have been furnished with such services pursuant to prior orders of this Court. The defendants agree to develop and provide a written habilitation plan, formulated in accordance with professional standards, to each member of the plaintiff class; provide an individualized habilitation program to each member of the plaintiff class; and permit each class member and his family or guardian to be heard in connection with his or her program. The defendants also agree to provide an annual review of each person's individualized habilitation program, and to monitor the services and programs provided to the class members in accordance with a detailed, professionally-established monitoring and visitation procedure. All defendants shall assure that all persons provided with services under the terms of the agreement shall be afforded: (1) protection from harm; (2) safe conditions; (3) adequate shelter and clothing; (4) medical, health-related, and dental care; (5) protection from physical and psychological abuse, neglect, or mistreatment; (6) protection from unreasonable restraint and the use of seclusion; and (7) protection from the administration of excessive or unnecessary medication.
 
 
 5
 Halderman v. Pennhurst State School and Hosp., 610 F.Supp. 1221, 1227 (E.D.Pa.1985).
 
 
 6
 The basic structure of the FSA is relevant to the resolution of this appeal. The FSA consists of four sections: the main body of the agreement, consisting of 22 paragraphs containing general obligations of the parties, conditions and definitions; Appendix A, which sets forth the specific obligations of the Commonwealth and the Counties as detailed in the district court's opinion quoted above; Appendix B, which allocates the funds made available by the closure of Pennhurst, establishes both a cost review procedure for the individual habilitation plans and a funding dispute resolution mechanism, and contains an application for federal funding; and Appendix C, which concerns the required notice to members of the class.
 
 
 7
 In March 1989, the ARC/PA filed several motions with the district court, joined in by the Halderman plaintiffs, for "Enforcement, Further Orders and Extension of the Final Settlement Agreement" as to the Commonwealth, and Montgomery and Delaware Counties. After holding evidentiary hearings over a period of four days between June 21 and July 6, 1989, the district court found that the Commonwealth and both Counties were in substantial noncompliance with the FSA. Specifically, the court found that Montgomery County was not providing the habilitative services mandated by the FSA to six members of the class, App. at 811-12, and that Delaware County was not providing the required habilitative services to 68 members of the class, App. at 810. In addition, the court found that the Commonwealth was in substantial noncompliance with the FSA because it was jointly responsible with the Counties for providing the habilitative services to the class members and also because it was failing to provide the necessary monitoring of the Counties' compliance. App. at 809, 811, 813-14.
 
 
 8
 The district court rejected the Appellants' arguments that under the terms of the FSA, the district court had lost jurisdiction over the case. First, the court found that the contractual obligations of Appendix A were, in effect, court orders. App. at 814-16. Second, the court found that the terms of the FSA--specifically pp 14-16--are unambiguous and provide the court with continuing jurisdiction to enforce its Appendix A orders. App. at 812-13. Alternatively, the court found that it had jurisdiction over the case, at least as to the Commonwealth, pursuant to a December 2, 1989 amendment of the FSA. App. at 812. The court interpreted the amendment as extending the jurisdictional period contained in the FSA to sometime in 1990.[4]
 
 
 9
 The district court entered an order on August 28, 1989, requiring the Commonwealth and the Counties to comply with all provisions of the FSA by March 1, 1990. App. at 801.[5] In addition, the court ordered that pp 10, 12-16, 18 and 21 of the main text of the FSA and pp A5(c), A5(e) and A8 of Appendix A "shall remain in full force and effect notwithstanding any language contained therein calling for earlier expiration...." App. at 802. The district court further ordered that the Commonwealth and the Counties are to file monthly progress reports to the court until they come into full compliance. App. at 802.
 
 
 10
 On appeal, the Commonwealth and the Counties contest both the district court's denial of their motions to dismiss on the jurisdiction issue and the court's finding that they are in substantial noncompliance with the FSA. On the compliance issue, the Commonwealth argues that, under state law, the Counties have the sole responsibility to place the class members in community living arrangements. In addition, the Commonwealth argues that the evidence presented at the hearing showed that it was providing the required monitoring services under the FSA. Montgomery County does not dispute that six members of the class from its county are not being provided the care mandated by the FSA, but contends that since 194 of the 200 former Pennhurst residents from Montgomery County are being properly cared for, the County is in substantial compliance. Likewise, Delaware County does not dispute the district court's finding that 68 members of the class from its county are not being provided the services mandated by the FSA. Rather, Delaware County's argument is that its obligations under the FSA are conditioned upon adequate funding from the Commonwealth which has not been forthcoming.[6] We have jurisdiction over these appeals pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 II.
 JURISDICTION
 
 11
 The first issue we address is the jurisdictional one. This circuit has not yet conclusively settled the question of whether courts have inherent jurisdiction to enforce settlement agreements in cases that were once properly before them. Compare Fox v. Consol. Rail Corp., 739 F.2d 929, 932 (3d Cir.1984), cert. denied, 469 U.S. 1190, 105 S.Ct. 962, 83 L.Ed.2d 968 (1985) and Kelly v. Greer, 365 F.2d 669, 671 (3d Cir.1966), cert. denied, 385 U.S. 1035, 87 S.Ct. 772, 17 L.Ed.2d 682 (1967) with Washington Hosp. v. White, 889 F.2d 1294, 1298-99 (3d Cir.1989). Under either view, the district court retained jurisdiction over the case sub judice. Its order approving the FSA under Fed.R.Civ.P. 23(e) reads in relevant part:
 
 
 12
 IT IS HEREBY ORDERED that the Final Settlement Agreement is APPROVED, and IT IS FURTHER ORDERED that the provisions of the Final Settlement Agreement executed on July 12, 1984 heretofore made a part of the record in this case shall have the full force and effect of an order of this Court.
 
 
 13
 App. at 53. Thus, the district court not only approved the FSA, but incorporated it into an order of the court. Cf. White, 889 F.2d at 1299 ("a stipulated agreement signed by the court does allow a district court to retain jurisdiction"); McCall-Bey v. Franzen, 777 F.2d 1178, 1188-89 (7th Cir.1985) (district court had jurisdiction to enforce a settlement agreement when the court's "order of dismissal states that it is pursuant to the parties' stipulation; the stipulation states that the dismissal is pursuant to the terms and conditions in the settlement agreement; and one of those terms is the sentence ['the parties retain their rights to petition the Court regarding any breach or violation of this agreement.']").[7] As the Court of Appeals for the Seventh Circuit has explained:
 
 
 14
 [Although] we have rejected the suggestion that federal judges have inherent power to enforce settlement agreements arising out of lawsuits that were once before them[,] ... we have expressed no doubt of the power of a district court to dismiss a lawsuit conditionally, retaining jurisdiction to effectuate terms of settlement agreed to by the parties. Nor do we think there is any magic form of words that the judge must intone in order to make the retention of jurisdiction effective. All that is necessary is that it be possible to infer that he did intend to retain jurisdiction--that he did not dismiss the case outright, thereby relinquishing jurisdiction.
 
 
 15
 McCall-Bey, 777 F.2d at 1188.
 
 
 16
 Even though the district court retained jurisdiction, however, the Appellants argue that under the explicit terms of the FSA such jurisdiction was for a limited time period and that that period expired before the district court entered its findings in August 1989. The FSA's built-in jurisdictional component is found in pp 14 and 16 of the main body of the text:
 
 
 17
 14. Subject to paragraphs 15 and 16 below, the parties agree that as of the dates specified in those paragraphs, the District Court will mark this case closed and settled, will vacate the judgment and all orders of the Court except those in Appendix A, which shall remain in effect permanently (subject to Fed.R.Civ.P. 60(b)), and will cease to have active jurisdiction of this case....
 
 
 18
 ....
 
 
 19
 16. The parties desire that there be an orderly transition to the cessation of active jurisdiction specified in Paragraph 14. For each of the five sets of County Defendants ... the "date specified" in Paragraph[ ] 14 ... shall be two years after the last of each of the County's residents leaves Pennhurst. For the Commonwealth Defendants, the "date specified" in Paragraph[ ] 14 ... shall be July 1, 1989.
 
 
 20
 App. at 23-24.
 
 
 21
 The Commonwealth argues that under the terms of p 16 of the FSA, the "date specified" in p 14 (on which the court "will mark this case closed and settled" and "cease to have active jurisdiction" with regard to the Commonwealth) was July 1, 1989. App. at 23. Since p 14, according to the Commonwealth's interpretation, states that, as of the "date specified," the district court ceases "active jurisdiction" over the case, the court lost jurisdiction to decide the compliance issue before it issued its August 1989 findings and order.
 
 
 22
 Likewise, Delaware County argues that the last of its residents left Pennhurst on April 2, 1987 and, therefore, according to pp 14 and 16 the district court lost jurisdiction over the case, vis-a-vis Delaware County, on April 2, 1989, i.e., two years later. This was well before the court's August 1989 findings and order. Similarly, the last Montgomery County resident left Pennhurst in August 1986, so the County argues that the district court lost jurisdiction over the case, vis-a-vis Montgomery County, in August 1988, one year before the district court rendered its decision in the instant case.[8]
 
 
 23
 ARP/PA and the Halderman plaintiffs counter that under the FSA, the district court retained subject matter jurisdiction over the case in order to enforce the obligations agreed to by the parties under Appendix A. According to the Appellees, the district court simply ceased active jurisdiction over the case as of the dates specified in p 16. The ARP/PA and the Halderman plaintiffs urge us to read the term "active jurisdiction" to mean simply "active supervision."
 
 
 24
 In resolving this dispute, we treat the FSA as a contract. See White, 889 F.2d at 1300; Fox v. United States Dep't of Housing, 680 F.2d 315, 319 (3d Cir.1982) ("[a]lthough consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken")[9]; Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114, 1119-20 (3d Cir.1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). The agreement should be construed consistently with fundamental precepts of contract construction. See United States v. ITT Continental Baking Co., 420 U.S. 223, 236-38, 95 S.Ct. 926, 934-36, 43 L.Ed.2d 148 (1975).
 
 
 25
 Thus, we must attempt to construe the FSA so as to give meaning to all of its words and phrases. White, 889 F.2d at 1300; Rossville Salvage Corp. v. S.E. Graham Co., 319 F.2d 391, 395 (3d Cir.1963) (contract construction "which gives effect and meaning to a term is to be preferred over one which makes such term mere surplusage or without effect"). Likewise, a clear provision cannot be overcome by a doubtful one, see Kingston Dodge, Inc. v. Chrysler Corp., 449 F.Supp. 52, 54 (M.D.Pa.1978), nor should a court adopt a construction that causes two reconcilable provisions to conflict, see Keystone Fabric Laminates, Inc. v. Federal Ins. Co., 407 F.2d 1353, 1356 (3d Cir.1969). Cf. Thermice Corp. v. Vistron Corp., 832 F.2d 248, 252-53 (3d Cir.1987).
 
 
 26
 Further, we are mindful that our task is not to reveal the "subjective intention of the parties 'but what [their] words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used.' " Fox, 680 F.2d at 320 (quoting Holmes, The Theory of Legal Interpretation, 12 Harv.L.Rev. 417, 419 (1899)). "As in statutory construction, we reject a view that would 'make a fortress out of a dictionary,' because a word or a phrase 'is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.' " Id., at 320 (quoting Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) (L. Hand, J.), and Towne v. Eisner, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372 (1918) (O. Holmes, J.), respectively).
 
 
 27
 Hence, in determining the meaning of the FSA's provisions our first resort is to the four corners of the agreement. United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); Fox, 680 F.2d at 319. "The instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." Armour, 402 U.S. at 682, 91 S.Ct. at 1757.[10] See also Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984). The agreement memorializes the bargained for positions of the parties and should be strictly construed to preserve those bargained for positions. See, e.g., Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983).
 
 
 28
 Applying these principles to the case sub judice, we find that the Appellants' proffered reading of the FSA is untenable and, according to the explicit terms of the FSA, the district court has continuing jurisdiction to enforce the Appellants' obligations under Appendix A.[11] The plain language of p 14 of the agreement provides that the provisions of "Appendix A ... shall remain in effect permanently." App. at 23 (emphasis added). The use of the word "permanently" conveys the definite impression that the parties did not envision that the obligations found in Appendix A would end on certain dates in the future.[12]
 
 
 29
 The Commonwealth tries to avoid this plain language by explaining that the parties meant the obligations of Appendix A would remain in effect permanently as moral rather than legal obligations. We find this position unconvincing. It is belied by the fact that p 14 clearly refers to the Appendix A obligations as "orders of the Court," not ethical commands. Furthermore, the Commonwealth's position flies in the face of the bracketed clause in p 14 which states that the district court's orders in Appendix A will remain in effect permanently, although "(subject to Fed.R.Civ.P. 60(b))." There is simply no reason to have written this bracketed provision into the FSA if the parties meant the obligations of Appendix A to be only moral obligations after July 1, 1989. Moral obligations are not subject to Rule 60(b), legal ones are. If the Commonwealth and the Counties wanted to violate a moral obligation, they certainly would not have to go back to federal court seeking to reopen the case in order to do so. The fact that the parties agreed that the obligations of Appendix A were to be permanent court orders, subject to Rule 60(b), strongly implies to us that the obligations were to be continuing legal obligations enforceable by appropriate judicial authority. See generally McCall-Bey, 777 F.2d at 1186 ("Any time a district judge enters a judgment, even one dismissing a case by stipulation of the parties, he retains, by virtue of Rule 60(b), jurisdiction to entertain a later motion to vacate the judgment on the grounds specified in the rule, some of which have no time limit.").
 
 
 30
 The Commonwealth and the Counties contend that such a reading of the Appendix A obligations conflicts with the final phrase of the first sentence in p 14 which states that on the dates specified the district court "will cease to have active jurisdiction of the case." They argue that the Appendix A obligations cannot be continuing legal obligations if the district court gives up its jurisdiction over the case on the dates specified.
 
 
 31
 What the Appellants' argument fails to appreciate, however, is the glaring qualification that the parties' have placed on the word "jurisdiction" in p 14. The Appellants would have us give no effect to the word "active" in the phrase "active jurisdiction." While admittedly not the most enlightening phrase, the fact that the parties chose to qualify the word "jurisdiction" suggests an attempt to contrast active jurisdiction with some other kind of jurisdiction, rather than no jurisdiction at all. For if the parties meant to imply that jurisdiction per se would end on the dates specified in p 16, then they could have simply left the word "jurisdiction" unqualified.
 
 
 32
 So, while "active jurisdiction" is not a legal term of art, we believe it is reasonable to suppose that normal speakers of English under these circumstances, i.e., the resolution of a complex class action suit necessitating the creation of various monitoring and support mechanisms, as well as an extensive amount of court attention, would use the term to mean that after the dates specified in p 14 the district court would cease "hands on" control over the matter and simply resort to the usual continuing jurisdiction that courts routinely exercise over their injunctions. In other words, the court would cease active supervision over the case after the dates specified. We note that the equating of "active jurisdiction" with "active supervision" is not an uncommon practice both in class action cases involving consent decrees, see Dowell v. Board of Educ., 890 F.2d 1483, 1492 n. 17 (10th Cir.1989); Vaughns v. Board of Educ., 574 F.Supp. 1280, 1327 (D.Md.1983), and in other contexts as well, see, e.g., L.H. v. Jamieson, 643 F.2d 1351, 1354 (9th Cir.1981) (discussing state court's jurisdiction over committed juveniles). Our construction has the benefit both of reconciling all of the provisions of p 14 and giving meaning to all its words and phrases; while the Appellants' proffered reading would treat the qualification of jurisdiction as mere surplusage.
 
 
 33
 Moreover, in light of the district court's extensive experience with this case and the FSA, we believe some deference is due to its conclusions about the meaning of the agreement's jurisdictional provisions. See Keith v. Volpe, 784 F.2d 1457, 1461 (9th Cir.1986).[13] We simply note that the district court stated at the evidentiary hearing that:
 
 
 34
 ... there is no question, I think I made that absolutely clear, if you are violating any orders in the Appendix, ... which are permanent orders, there is no question. And that--why label them permanent? What would have been the sense of a Court issuing orders that if the orders were only to be in effect for two years or three years? What kind of relief would that have been for the members of the class?
 
 
 35
 That would have been a farce. And this Court did not consider the Settlement Agreement to have been a subterfuge to do something for a short period of time, and then revert back to the old methods.
 
 
 36
 App. at 341-42.
 
 
 37
 For the foregoing reasons, we reject the Appellants' reading of the FSA and accept the district court's construction as better reflecting the bargained for positions of the parties as evidenced by the four corners of the instrument.[14] Thus, we find that the district court had jurisdiction to decide the compliance issue.[15]
 
 III.
 SUBSTANTIAL COMPLIANCE
 A. The Commonwealth
 
 38
 The district court found that 68 members of the class from Delaware County and six members from Montgomery County are not receiving the habilitative services mandated under the FSA. In particular, these members have either not been provided with Transitional Individual Habilitation Plans ("TIHPs"), Individual Habilitation Plans ("IHPs"), proper placement in accord with individualized habilitation plans, or, in some cases, adequate staff support, treatment, recreational and social activities, medical care, and occupational and speech therapy. App. at 809-811. In addition, the court found that there is an inadequate number of county case managers to service the needs of class members from Delaware County. App. at 810. The district court concluded that the Commonwealth is jointly responsible with the Counties for these deficiencies under pp A1-A4 of Appendix A, as well as responsible for inadequate monitoring of the Counties with regard to the formation and implementation of TIHP's, and the provision of habilitative and other services. App. at 813-14.
 
 
 39
 The Commonwealth contends that it is in compliance with the FSA. First, the Commonwealth argues that as a matter of basic contract law, existing state law and regulations implicitly form part of every contract. Since state law puts the responsibility on the Counties for placing retarded individuals into the community, the Commonwealth cannot be in violation of the FSA on placement grounds. Second, the Commonwealth argues that even if it is responsible for community placement, the facilities now housing the class members are adequate community living arrangements ("CLAs") under applicable state regulations. Third, the Commonwealth argues that the evidence presented at the hearing shows that it is providing adequate monitoring services. We find none of these arguments persuasive.
 
 
 40
 While the Commonwealth is correct that a principle of basic contract law is that statutory and regulatory provisions of the state in which the contract is executed or performed become a part of the contract, this expression of the rule is incomplete. One plain and obvious exception to this broad principle is where the contract discloses a contrary intention. See 17 Am.Jur.2d Contracts Sec. 257, 656 & n. 3 (1964) (cases cited therein); 17A C.J.S. Contracts Sec. 330 (1963). See, e.g., Skandia America Reinsurance Corp. v. Schenck, 441 F.Supp. 715, 724 (S.D.N.Y.1977) ("Unless the contract provides otherwise, the law in force at the time it is entered into becomes a part of the contract") (applying New York law). This exception has been generally recognized by Pennsylvania courts. See Meneice v. Camp Kadimah Co., 157 Pa.Super. 380, 383, 43 A.2d 621, 622 (1945) (where existing law may affect a contract, the incorporation of the law into the contract is a matter of the intent of the parties); Morse v. Maurer, 35 Pa.Super. 196, 198-99 (1908). Cf. Commonwealth ex rel. Schnader v. U.S. Fidelity & Guaranty Co., 314 Pa. 140, 170 A. 686, 688 (1934) (court should not accept a construction of a contract which would conform to the language of a federal statute when the parties intended to disregard the statute). It is indisputable that the Commonwealth explicitly agreed in Appendix A to be jointly responsible with the Counties for providing CLAs to class members as provided for in their individual habilitation plans, as well as community services necessary to provide them with minimally adequate habilitation. App. at 31. So the fact that, absent the FSA, a different allocation of responsibility might be imposed by state law is irrelevant to our determination whether the Commonwealth is in violation of its voluntarily agreed to obligations under the FSA.
 
 
 41
 Likewise, the Commonwealth's appeal to state mental health regulations to show that CLAs can range as high as 20 clients per unit, see Brief for Appellant Commonwealth at 31, is unavailing. First, even if the argument succeeded it would only establish, at best, that 28 class members from Delaware County, out of the 74 class members cited by the district court as receiving inadequate treatment, have received proper placement, i.e., 12 class members at a 12 bed facility located on the main campus of Elwyn Institute and 16 class members in two eight bed facilities in Aston. App. at 810. And, even as to the class members at the 12 bed facility on Elwyn's main campus the Commonwealth's argument is weak. The Director of Mental Retardation Services for Delaware County, Dr. Steve Chafetz, testified that he made a mistake in advising Delaware County to change the original eight bed facility at the site into a 12 bed facility because "the clients were not able to get the individual care that they got when it was an eight bed facility." App. at 442.
 
 
 42
 But more importantly, we believe that the Commonwealth misconstrues the import of the district court's finding. As we read the FSA, the testimony, and the district court's opinion, the Commonwealth and the Counties are required to provide each individual class member community placement when it is called for by the individual's planning process. App. at 31. This individual process includes, inter alia, initial TIHPs which specify the services necessary to facilitate an individual's transfer to a residential facility; written IHPs which incorporate the assessments of an interdisciplinary team as to the individual's goals and the habilitative services necessary to meet those goals; and, importantly, approval and monitoring of all plans by the Special Management Unit ("SMU"), a group of Commonwealth employees. App. at 27-28. The district court's finding that 68 Delaware County and six Montgomery County residents are not receiving the community living arrangements mandated by the FSA, is simply a finding that the class members are not being adequately provided with the court-mandated individualized habilitation process, whether that inadequacy is evidenced by a lack of a TIHP, IHP, SMU approved residential placement or IHP required occupational, therapeutic, recreational, social or medical care and treatment. Thus, we agree with the Halderman plaintiffs when they argue that what is at issue in this appeal is not the definition of how many individuals can be housed in a facility before it no longer is a CLA, but whether the class members are all receiving the individual attention and planning that they have a right to under the agreement. The district court found that 74 were not being so provided and none of the Appellants have effectively attacked this finding as clearly erroneous.
 
 
 43
 Finally, the Commonwealth argues that its monitoring obligations were carried out fully and adequately. The Commonwealth points to the testimony of Vicki Stillman-Toomey, the Regional Program Manager for the Southeast Region which is responsible for the SMU, to the effect that the SMU completed all 120 on-site visitations to class members as required by the FSA, it monitored up to 100% of the class members until County quality assurance programs were in place and it continues with follow-up and spot check visitations even after the two and a half year period mandated by the FSA. App. at 520-21. However, as we read the district court's opinion, the court found the Commonwealth in violation of its monitoring duties not because of inadequate on-site inspections or its failure to oversee the FSA process, but in its apparent lack of authority to force counties into compliance when deficiencies are identified. As the court explained:
 
 
 44
 When deficiencies are identified, the unit notifies the involved County officials, attempts to persuade them to take corrective action, and follows up to determine if corrections are made. When "jawboning" fails, the Unit perceives itself as powerless to obtain compliance. The Special Management Unit has apparently never undertaken any other measures to correct a county's failure to supply the habilitation to which a class member is entitled pursuant to the Settlement.
 
 
 45
 App. at 814. The district court quite naturally interpreted "monitoring" to include not just note-taking, but corrective action if necessary. Thus, the district court found the Commonwealth in substantial noncompliance with its monitoring obligations because it never took any enforcement steps, beyond persuasion, to correct the large number of problems its on-site, and other, inspection visits have revealed. This factual finding is clearly supported by both the testimony of Vicki Stillman-Toomey, see App. at 561-67, and Philip S. Briscoe, the Director of the SMU, see App. at 209-215.[16]B. Montgomery County
 
 
 46
 The district court found that six out of the original 200 residents of Pennhurst from Montgomery County are not being provided the habilitative services mandated by the FSA. Montgomery County does not dispute this finding; instead, the County argues that because 97% of its class members have been provided with adequate services, it is in substantial compliance with the FSA. We disagree.
 
 
 47
 While the original suit in this case was a class action, the obligations of the Commonwealth and the Counties under the FSA clearly run to class members as individuals, not as a group. Indeed, the entire thrust of the FSA is a promise by the Commonwealth and the Counties to treat the class members as unique individuals with different needs and habilitative requirements. For example, the IHP is supposed to be an individualized treatment program "based upon an ... assessment of an individual's strength and needs ... set[ting] forth specific short and long term goals and objectives for the person's habilitation and specif[ying] the services and the methods for delivering them which are necessary to the individual's habilitation," App. at 28 (emphasis added); all professional decisions must be "based upon all information relevant to the habilitation and placement of the individual," App. at 29 (emphasis added); and the requirement of a CLA is tied to the "individual planning process," App. at 31 (emphasis added).
 
 
 48
 Moreover, the principle advanced by Montgomery County, though not recognized by the County we assume, would appear to allow the County, at least consistently with the FSA, to treat a few retarded class members in any fashion they want so long as they comply with the FSA with regard to a substantial number of other retarded class members. It is safe to say that this inequitable and disconcerting principle is not what the parties contemplated when they agreed to the FSA, it is not within the specific language of the agreement, and it certainly is not part of the spirit with which the parties resolved this troublesome litigation. It is the individual rights of retarded individuals the FSA seeks to protect not some class construct. Therefore, we agree with the district court that substantial compliance must be measured with respect to the services each individual retarded class member is receiving and not with respect to the services received by the class as a whole.
 
 C. Delaware County
 
 49
 The district court found that 68 former residents of Pennhurst from Delaware County are not receiving the habilitative services mandated by the FSA. Delaware County does not contest this finding, but instead argues that under p 13 of the FSA its obligations are expressly conditioned on complete funding by the Commonwealth. Since the County alleges that the Commonwealth has failed to adequately fund the placement programs mandated by the FSA, its obligations under Appendix A, it contends, are tolled and thus it cannot be in substantial noncompliance with the agreement.
 
 
 50
 This argument is not unappealing, since the Commonwealth seems to implicitly concede that it might not be giving Delaware County enough money both to fund services for the plaintiff class of retarded individuals and to maintain the same level of services for the nonplaintiff class of retarded individuals already receiving aid from Delaware County. See Brief for Appellant Commonwealth at 28-29. Nevertheless, we do not believe that Delaware County's argument is valid as a defense to an enforcement action by the Appellees.
 
 
 51
 Paragraph 13 of the FSA reads in relevant part: "The obligation of the County Defendants to provide services under this [FSA] is conditioned upon the provision by the Commonwealth Defendants of complete funding for such services...." App. at 22. Thus, under the terms of p 13, Delaware County must satisfy its obligations under the FSA if the Commonwealth gives it enough money to fund the services mandated by the FSA. From the testimony at the hearing, there was no dispute that had Delaware County used the general community residential funding provided by the Commonwealth to satisfy its obligations under the FSA first, the funds would have been sufficient to meet the habilitation needs of all the class members. App. at 485 (testimony of Dr. Chafetz). In our view, this is all that the language of p 13 requires. It does not mandate any specific funding level for the nonplaintiff class of retarded individuals, in addition to complete funding for class members.[17]
 
 
 52
 Thus, we find that p 13 does not provide Delaware County with a valid defense to an enforcement action by the Appellees as to its joint obligations under Appendix A. We caution that our holding does not mean that Delaware County does not have a legitimate action directly against the Commonwealth, either under some contractual provision in the FSA or some other statutory source, in order to obtain complete funding for the plaintiff class and the maintenance of existing funding levels for the nonplaintiff class of retarded individuals. We simply hold that a claim that general funding from the Commonwealth has been insufficient to meet a county's mental health needs cannot be used to avoid that county's obligations under the FSA.[18]
 
 IV.
 
 53
 To summarize, we agree with the district court that under the plain terms of the FSA, the district court had jurisdiction to enforce violations of its orders in Appendix A. In addition, we find no errors in the district court's determination that the Commonwealth, Montgomery County and Delaware County are all in substantial noncompliance with the terms of Appendix A. Costs taxed against the Appellant in each of the appeals.
 
 
 
 *
 The Honorable Alfred J. Lechner, Jr., United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 For a discussion of the history of this litigation, see Halderman v. Pennhurst State School and Hosp., 610 F.Supp. 1221, 1224-26 (E.D.Pa.1985)
 
 
 [2]
 The plaintiff class as certified by the district court, consisted of all retarded persons residing at Pennhurst as of May 1974, persons "who are on a waiting list for placement at Pennhurst," and persons residing in the defendant counties but "who, because of the unavailability of alternative services in the community, may be placed at ... Pennhurst...." Halderman v. Pennhurst State School and Hosp., 610 F.Supp. 1221, 1228 (E.D.Pa.1985). The settlement agreement amended the certified class to exclude persons who were either on a waiting list or who might have been, but were not, placed at Pennhurst. We will refer collectively to this latter class as the "Halderman plaintiffs" or the "plaintiff class."
 
 
 [3]
 ARC/PA's name in 1975 was the Pennsylvania Association for Retarded Citizens
 
 
 [4]
 The FSA originally provided that Pennhurst would be closed on July 1, 1986. The amendment on December 2, 1986, as to which only the Halderman plaintiffs, the ARC/PA, the Commonwealth and Philadelphia County were parties, extended the date for the closing of Pennhurst until October 31, 1986. The amendment also was apparently meant to change the dates on which the district court was to lose "active jurisdiction" over the case. Paragraph 7 reads:
 The time for ending the Court's active jurisdiction set forth in the [FSA] is hereby tolled until the last resident of the Defendant County or out-of-region counties leaves Pennhurst for an appropriate community placement, at which time the specified time period shall continue to run. Provisions of the [FSA] not otherwise affected by this Amendment shall remain unchanged.
 App. at 56-57. Sometime after the December 2, 1986 amendment, a stipulation was approved by the court again extending the date of closure until October 26, 1987. Pennhurst was finally closed on October 27, 1987.
 
 
 [5]
 In its opinion, the district court noted that its initial reaction was to find the Commonwealth and the two Counties in contempt for violating the court's orders in Appendix A, but reconsidered after recognizing that a majority of the 1200 former Pennhurst residents covered by the FSA had already been helped by the Appellants' efforts at compliance
 
 
 [6]
 We note that none of the Appellants has raised as an issue the remedial provisions contained in the district court's August 1989 order
 
 
 [7]
 See also United States v. Baus, 834 F.2d 1114, 1127 n. 13 (1st Cir.1987) (noting that some courts have held "that while federal courts necessarily have the power to vacate their own judgments, they do not necessarily have jurisdiction to hear collateral disputes arising under state contract law, at least not where the district court has not explicitly retained jurisdiction or where the district court has not approved of the settlement agreement and incorporated it into an order of the court....") (emphasis added) (citations omitted)
 
 
 [8]
 In effect, the Commonwealth and the Counties are urging us to read the term "active jurisdiction" in p 14 to mean simply "jurisdiction."
 
 
 [9]
 We note that this Court has held that a Stipulation of Dismissal that is "so ordered" by the district court is the functional equivalent, and has the same effect as, a consent order or consent decree. Washington Hosp. v. White, 889 F.2d 1294, 1299 & n. 9 (3d Cir.1989). Accord Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983) ("A consent decree is essentially a settlement agreement subject to continued judicial policing") (cases cited therein)
 
 
 [10]
 The Supreme Court has explained:
 Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.... Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purpose of one of the parties to it.
 United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757-58, 29 L.Ed.2d 256 (1971) (emphasis in the original).
 
 
 [11]
 The construction of the FSA is a matter of law over which we exercise plenary review. See, e.g., Washington Hosp. v. White, 889 F.2d 1294, 1299 (3d Cir.1989)
 
 
 [12]
 We find that what ceases on the "dates specified" in p 14 is the active supervision of the district court over the rights, obligations and conditions specified in the main body of the FSA and Appendices B and C. See discussion, infra, at p. 322-23
 
 
 [13]
 Although we emphasize that given our above analysis we need not rely on the district court's view for our conclusion here
 
 
 [14]
 Although not argued as such by any party, we also do not find the FSA to be ambiguous. To be ambiguous, an agreement must be reasonably capable of more than one construction. White, 889 F.2d at 1301. But it is incumbent on the Appellants to provide us with a reasonable, tenable reading of the agreement which varies from that adopted by the district court. See Thermice Corp. v. Vistron Corp., 832 F.2d 248, 252 (3d Cir.1987). Cf. ITT, 420 U.S. at 234, 235, 95 S.Ct. at 933, 934 (describing the first analytical step under Armour and its progeny as determining whether the language of the decree can support the construction urged by the nonprevailing party below). And while a court should consider reasonable alternative semantic references advanced by the parties, the court should not demote the written word to a reduced status. See Mellon Bank v. Aetna Business Credit, Inc., 619 F.2d 1001, 1013 (3d Cir.1980). Because the Appellants' proffered reading of the FSA would either give no effect to the plain language of the agreement calling for the permanency of the provisions contained in Appendix A, or else conflict with language in p 14 to the effect that the Appendix A obligations are legal and subject to Federal Rule of Civil Procedure 60(b), as well as read the qualifying word "active" right out of the agreement, we find that the Appellants' construction is untenable. Since no other possible reading is before us, we believe that the FSA is unambiguous in calling for the continuing jurisdiction of the district court over its Appendix A orders
 
 
 [15]
 As a result of our analysis, we need not address the alternative basis on which the court exercised jurisdiction over this matter, i.e., the December 2, 1986 amendment's alleged extension of the time period over which the court retained jurisdiction
 Furthermore, we do not find that the 30 day notice provision of p 18 speaks to the question of jurisdiction such that it would bar the district court from reaching the compliance issue as Montgomery County asserts. Paragraph 18 memorializes certain promises the parties have made to each other; it does not deal with the power of the federal courts. Montgomery County is the only Appellant to raise this issue, and although the County only phrases its argument in terms of jurisdiction, we also do not believe that the district court erred in failing to dismiss the Appellees' claim against Montgomery County based on the substantive contractual provision. Clearly, the parties did not intend p 18 to allow the counties to surreptitiously hide their noncompliance and bide their time until "caught" by the Appellees, and then when "caught" to have an additional 30 days in order to remedy their intentional noncompliance. Rather, the parties' purpose was surely to require the Appellees to notify the counties of problems that the counties themselves might not be aware of so that the problem can get corrected without court intervention. Certainly, the adequate provision of services to the retarded class members is, or should be, a concern and priority with all parties to this litigation. This being the case, the fact that the motion for enforcement was filed in March 1989, the evidentiary hearing was not held until the end of June 1989, and the court's findings were not made until August 1989, shows that the mere lack of notice to Montgomery County was not a sufficient spur to remedial action. Indeed, to our knowledge the County was still not in compliance at the time of oral argument in March 1990, approximately one year later. Thus, under these circumstances, to dismiss this action as to Montgomery County and require the Appellees to provide the County with notice and then wait 30 days before instituting suit would serve no contractual or just purpose.
 
 
 [16]
 The Commonwealth also argues in its brief that it provided the advocacy services and case manager training required under the FSA. See Brief for Appellant Commonwealth at 33. This would appear to be simply a mistaken carry over of its identical arguments found in the Commonwealth's Post-Hearing Brief in Opposition to Plaintiffs' Motions for Enforcement, Further Orders and Extensions of the Final Settlement Agreement, App. at 742, since we searched in vain for a finding by the district court that the Commonwealth was in substantial noncompliance on these grounds. Nor do we believe that the court could have found noncompliance on these grounds because the advocacy requirement does not appear in Appendix A and from our review of the record there was insufficient evidence presented at the hearings to support a finding that the Commonwealth provided inadequate training of case managers
 
 
 [17]
 Paragraph 13 seems to be the counterpart to p 17 which allows the Commonwealth to petition the court and avoid its obligations under the FSA if the General Assembly either fails to appropriate sufficient funds to implement the FSA or fails to increase funding for community services equal to or greater than the funding saved by closing Pennhurst. No arguments were made to the district court, or this Court, that either of these events had occurred
 
 
 [18]
 We observe that pp B10-B13 of the FSA appears to set up "final and binding" arbitration as the way to settle any funding disputes between the Commonwealth and the Counties