**INTERSPIRO USA, INC., n.k.a. Pharos Protection USA, Inc. and Pharos Tech USA, Inc., Plaintiff,**

v.

**FIGGIE INTERNATIONAL, INC., Defendant.**

Civ. A. No. 88–267–RRM.

United States District Court, D. Delaware.

March 16, 1993.

Jeffrey B. Bove, Connolly, Bove, Lodge and Hutz, Wilmington, DE, Mari G. Shaw, Martin J. Black, Dechert Price and Rhoads, Dale M. Heist, Albert J. Marcellino, Woodcock, Washburn and Kurtz, Philadelphia, PA, for plaintiff.

Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Regan J. Fay, John A. Wasleff, John S. Cipolla, Jones, Day, Reavis and Pogue, Cleveland, OH, for defendant.

## TABLE OF CONTENTS

FACTS
 A. Invention Background 1494
 B. Suit and Settlement 1497
 C. Development of the E–Z Flo 1497
 D. Post–Settlement Events 1499

DISCUSSION
 I. Jurisdiction 1500
 II. Is the E–Z Flo a "new product" not covered by the Settlement Agreement? 1501
 III. Does the E–Z Flo fall within the scope of the '145 patent? 1503
 A. Literal infringement 1504
 1. "means for establishing gauge pressure ..." 1505
 a. movable member 1505
 i. Is the pressure chamber a required means? 1505
 ii. comparison of the "movable member" with the corresponding structure in the E–Z Flo 1507
 b. "biasing means" 1507
 c. "means for releasing gauge pressure" 1507

2. "detent means ... for moving and maintaining [the] movable member ..." 1508
 a. detent means 1508
 b. "for releasing the movable member in response to inhalation" 1509
 c. "for moving and maintaining the movable member" 1509
 i. moving the movable member 1510
 ii. maintaining the movable member 1511
 iii. maintaining the inlet valve in a closed position 1511
 iv. automatic reestablishment of gauge pressure 1511
B. Doctrine of equivalents 1512
IV. Featherweight Cylinder 1513
V. Figgie's sales to unaffiliated entities—SSA's status under the Settlement Agreement 1514
VI. The Pharos Audit 1517
 A. Figgie's failure to provide the auditors with information concerning Figgie's ownership interests in its distributors 1518
 B. Figgie's failure to provide SSA's invoices 1519
 C. Figgie's refusal to provide an E–Z Flo Regulator, or information concerning it, immediately upon request 1519
VII. Attorneys' Fees 1520

## OPINION

McKELVIE, District Judge.

This is a patent case. The dispute arises out of an agreement, entered into by one of the plaintiffs, Interspiro USA, Inc. ("Interspiro") (n.k.a. Pharos Protection USA, Inc.) and defendant, Figgie International, Inc. ("Figgie"), settling a patent infringement lawsuit brought by Pharos. Pharos had claimed that Figgie infringed Pharos' patents for types of breathing regulators, U.S. Patent Nos. 4,361,145 ("'145 patent") and 3,716,053 ("'053 Patent"), most commonly used in the protective masks worn by firefighters, by manufacturing and selling a regulator known as the "Donning Switch." Figgie had asserted defenses of non-infringement and invalidity of the patents.

The parties' Settlement Agreement required, *inter alia*, Figgie to pay royalties for sales of certain regulators, including the Donning Switch. Sometime after the Court approved the Settlement Agreement, Figgie began to manufacture and sell another regulator, the "E–Z Flo Regulator," without paying royalties pursuant to the Settlement Agreement. The plaintiffs Pharos Protection USA, Inc. and Pharos Tech USA, Inc. (collectively, "Pharos"), who had since acquired Interspiro's rights under the Settlement Agreement, now claim that Figgie's manufacture and sale of the E–Z Flo, in addition to other practices allegedly depriving Pharos of its fair share of royalties, violates the Settlement Agreement, and have moved to enforce the Settlement Agreement. Docket Item ("D.I.") 91. Pharos' claims relate only to the '145 patent, as the '053 had expired prior to the events culminating in Pharos' motion. Pharos seeks damages for Figgie's breaches as well as attorneys' fees arising from Figgie's "bad faith."

From May 19, 1992, to May 21, 1992, the Court held a hearing on Pharos' motion. D.I.s 219–221. This is the Court's decision on the Motion to Enforce the Settlement Agreement.

## FACTS

### A. *Invention Background*

Because firefighters work in highly dangerous environments, they use and carry a panoply of safety equipment. Among the most important is the Self Contained Breathing Apparatus (SCBA), a breathing device which protects firefighters from toxic fumes and supplies them with oxygen. SCBAs basically consist of a mask, an oxygen tank, and a regulator. The regulator, which is attached to the mask, is, essentially, a sophisticated valve. It allows a firefighter to inhale

oxygen from the tank and also to exhale waste gases, and therefore is somewhat similar to the regulators SCUBA (an acronym for self-contained underwater breathing apparatus) divers use to obtain oxygen.

When the regulator valve opens to allow oxygen to enter the mask from a pressurized tank (the resulting rush of air is called "free flow"), the inside of the mask becomes temporarily pressurized. A pressurized mask is said to have "positive pressure" (also known as "gauge pressure" or "safety pressure"). Because at positive pressure the air pressure is greater inside the mask than outside, air from outside cannot flow into the mask. Conversely, when a mask does not maintain positive pressure, ambient air is free to leak into the mask, perhaps through leaks, cracks or gaps. Positive pressure inside the mask thus protects a firefighter from the dangerous fumes common in the firefighter's working environment.

The first SCBAs were equipped with regulators and masks which did not continuously maintain positive pressure inside of the mask. Instead, they maintained positive pressure only when the wearer inhaled and the regulator allowed pressurized oxygen to enter the mask; any increase in pressure was temporary. When the wearer was not inhaling (or exhaling), the inside of the mask was not pressurized, and the wearer was exposed to airborne toxins.

In 1971, Interspiro introduced its first SCBAs which could continuously maintain positive pressure. Interspiro patented at least one such device in 1973. Others received patents for SCBAs that maintained continuous positive pressure; for example, Dragerwerk AG received a German patent for such a device ("Drager Patent") in 1977. In such "positive pressure" masks, oxygen

flows continuously into the mask, except during a brief period of exhalation. Positive pressure is nevertheless always maintained in the mask, as during exhalation it is the user's lungs, rather than the oxygen tank, that pressurizes the mask by forcing air into it.

While the introduction of continuous positive pressure was an important safety advance, a significant problem remained. Many of the positive pressure masks required that the positive pressure feature be turned on manually. Consequently, in stressful situations, a firefighter could forget to activate the positive pressure feature. Thinking positive pressure to have been established in the mask, the firefighter could unfortunately enter an environment where he might be susceptible to colorless, tasteless, and perhaps deadly fumes leaking into his mask.

In 1980 or earlier, two inventors, Ekstrom and Wettengren, found a solution to the problem. They designed a regulator that allowed the SCBA to supply positive pressure automatically upon the wearer's initial inhalation after putting on the mask. Turning off positive pressure—necessary to conserve the oxygen when the SCBA is not in use—remained a manual operation (pressing a button on the regulator). The automatic-on/manual-off function was made possible by employing a "detent mechanism"—which will be described in detail below—in the regulator. A user's initial inhalation would overcome the force holding the detent, and hence the regulator, in the off mode. The masks would then have positive pressure. Only by pressing a switch could the detent be restored to a position in which it would hold the regulator in the off position. A schematic of the invention appears below:

Roughly, the regulator works as follows: As the wearer breathes in and out, the resulting changes in air pressure inside the housing of the regulator force what is essentially a diaphragm to move back and forth. On the drawing above, that diaphragm consists basically of items (7), (12), and (13); items (12) and (13) are rubber discs which are attached at their circumferences to the housing by a ring of flexible material (7) which allows the discs to move within the housing. In this diagram, exhalation would tend to push the discs toward the exhalation chamber (4) at the top of the drawing; inhalation would tend to pull the discs toward the inhalation or inlet chamber (6) at the bottom of the drawing. Additionally, the movement of the diaphragm toward the top of the housing is resisted by a biasing spring (19), which is attached to the top of the diaphragm at one end and to the housing at the other end. When the user finishes exhalation, the biasing spring pushes the diaphragm back toward the bottom of the housing.

The diaphragm is attached to a valve (11) by a controlling arm (28). As the user exhales the diaphragm moves up, thereby pulling on the valve through the controlling arm. At a certain point the valve is pulled closed, and no oxygen enters the mask. Conversely, as the user inhales (through the inhalation port (9)) and the diaphragm is pulled down, the controlling arm eventually forces the valve to open, thus allowing oxygen once more to enter the mask. The valve is maintained in the open position except when the user exhales and when the regulator is placed in the shut-off mode, described below. In that way the regulator ensures continuous positive pressure when the SCBA is in use.

The detent mechanism (31) can be used to shut off the regulator such that it becomes locked in the shut-off mode. When manually activated, the detent arm swings up (note the dashed outline on the diagram) and locks the

diaphragm in a position toward the top of the regulator, against the force of the biasing spring. So locked, the diaphragm maintains the valve in a closed position. Upon a user's first inhalation, however, the diaphragm is pulled down with sufficient force so as to cause the detent to snap back into its unlocked position, thus allowing air to flow into the mask and allowing the diaphragm to move freely back and forth until the user next activates the detent.

Significantly, unlike the device described in the Drager Patent, which could be operated without the positive pressure feature, the Ekstrom and Wettengren device could be operated only in a positive pressure mode. While the Drager Patent also had an automatic-on/manual-off feature, a user could replace the mask and breathe without activation of the positive pressure feature. In 1980, Ekstrom and Wettengren obtained the '145 patent for their invention. The National Fire Protection Association, which sets standards for firefighting equipment, now requires that all breathing masks operate only with the positive pressure feature.

### B. *Suit and Settlement*

Defendant Figgie is a Delaware corporation. Scott Aviation, a Buffalo, New York, division of Figgie, manufactures and sells SCBAs. Safety Supply America ("SSA"), a subsidiary of Figgie, distributes Scott Aviation products, including SCBAs.

In 1985, Figgie sold SCBAs with regulators which automatically switched the positive pressure feature on and off. The automatic shut-off feature on the Figgie regulator occasionally caused, however, premature shut-off of positive pressure. Moreover, the regulator was most likely to malfunction during periods of peak exertion by the user. As a result, some users of Figgie's regulators complained of incidents of premature shut-off. In response, on April 19, 1985, Figgie warned its users about the problem, and offered to retrofit each user's SCBA with a new regulator, the Donning Switch regulator.

The Donning Switch regulator, like the design in the '145 patent, had automatic-on/manual-off regulation of positive pressure. Figgie consequently began to manufacture,

sell, and retrofit old masks with the Donning Switch regulator. Mr. Hans Almqvist, then President of Interspiro, obtained a Donning Switch regulator, examined it, and contacted patent counsel, who advised him that the Donning Switch regulator infringed the '145 patent. Interspiro sent a notice of infringement to Figgie.

At first, attempts to settle the dispute failed, and on May 19, 1988 Interspiro filed this action in this Court against Figgie. Figgie asserted defenses of invalidity and non-infringement. Regarding the non-infringement portion of its defense, Figgie argued that the Donning Switch lacked a "pressure chamber" (in the regulator) and that a pressure chamber was a requirement of the '145 patent. Pharos countered that the Patent Examiner had specifically removed any reference in the patent to a pressure chamber.

Following substantial and lengthy negotiations, the parties ultimately reached a settlement. The ensuing Settlement Agreement contained provisions for Figgie to pay royalties to Interspiro on the sale of each SCBA containing a Donning Switch and provisions allowing Interspiro to audit Figgie to ensure compliance with the Agreement. It also provided that the Court would retain jurisdiction over the Settlement Agreement for a period of two years. The parties submitted the Settlement Agreement to the Court with a Proposed Stipulated Order dismissing the case pursuant to the terms of the Agreement. On November 13, 1989, the Court signed and entered the Stipulated Order. D.I. 83.

### C. *Development of E–Z Flo*

Before the suit was filed and while the Interspiro/Figgie dispute was in its initial stages, Figgie, through its Scott Aviation division, considered alternatives to the Donning Switch. In 1987, Robert Richter, then Scott Aviation's Vice President of Engineering, prepared a document to evaluate design concepts for avoiding Interspiro's infringement allegation. PX–10. His report, entitled "Engineering Cost," suggested two possible approaches: a "new design approach" and a "circumvent design approach." The "new design approach" involved the creation of a totally new regulator design. It would cost more than the "circumvent approach,"

but would have little or no danger of infringing the '145 patent. The "circumvent approach," riskier (in terms of potential infringement) but requiring less capital investment, would involve designing around the patent claims. Mr. Richter further described four efforts Figgie had already initiated to circumvent the patent. The second of these described an automatic-on/manual-off regulator, whose circumvention of the '145 patent was "unknown." It would avoid infringement by relocating an important mechanism described in the '145 patent, the detent mechanism, from one side of a diaphragm that moves back and forth within all regulators, to the other.

Scott Aviation never officially adopted either approach; nevertheless, it began to design an ostensibly new regulator based largely, if not entirely, on the concepts utilized in the Donning Switch. The resulting product, the E-Z Flo Regulator, would have exactly those features described by the second of the "circumvent approach" efforts.

In mid-May, 1988, after Interspiro already had approached Scott Aviation about infringement of the Donning Switch, Scott Aviation fired Mr. Richter. In December, 1988, Mr. Alan H. Light, then President of Scott

Aviation, Mr. Eugene Giorgini, Engineering Manager of Scott's Health and Safety Division, and Mr. Edward Replogle, an engineer with "quite a bit of patent experience" who was hired by Scott Aviation as a consultant, met to discuss design options for eliminating the infringement problem. Mr. Replogle proposed saving as much of the existing product as possible, but did not then propose a specific plan.

Mr. Replogle subsequently began design work. First, he tried to use a "magnetic detent"; however, this design approach was abandoned. Then he tried using a "spring detent," had that concept reviewed by patent counsel, and drew up an initial proposal. The "spring detent" would operate on a different side of the diaphragm than the detent in the Donning Switch and '145 patent. In initial sketches dated December 30, 1988, Mr. Replogle used the label "spring detent." Subsequent sketches by Mr. Giorgini, however, had labelled the same device a "latching lever." Scott Aviation developed its device with a "latching lever" into the E-Z Flo Regulator. A schematic of the E-Z Flo Regulator, here drawn in the "static" mode—the mode in which the regulator is in during normal use—appears below:

E-Z FLO™ REGULATOR
STATIC MODE

The E–Z Flo is depicted above such that a user would inhale from the bottom of the regulator and force exhaled gases through the top.

Just as in the '145 device, in the E–Z Flo the action of a diaphragm opens and closes the regulator valve at appropriate times. In the E–Z Flo, the "diaphragm"—composed of two discs, the smaller one ordinarily resting just below the larger disc, which is attached to the housing by a ring of flexible material—impinges on the "diaphragm lever," which in turn opens or closes the "demand valve." The E–Z Flo also has a biasing spring, here labeled a "compression spring," that resists the movement of the diaphragm as it moves toward the top of the housing, and pushes the diaphragm back toward the bottom of the housing following exhalation.

The E–Z Flo accomplishes shut-off by means of a "latching lever." When manually operated, the latching lever rotates toward the top of the housing, thereby compressing the biasing spring such that it cannot push against the diaphragm. When latched, the force of the biasing spring is completely removed, such that all of the forces acting on the diaphragm push it upward, maintaining the regulator in the shut-off mode. Inhalation pulls the diaphragm downward with sufficient force to overcome the latch, allowing the diaphragm to move again, and thereby establishes positive pressure.

As discussed below, Figgie highlights two major differences between the '145 device and the E–Z Flo. These differences generally relate to the structures of the two devices' diaphragms and to the structure and operation of the "detent means" of the '145 device as compared to the "latching lever" of the E–Z Flo.

D. *Post–Settlement Events*

At a trade show in Las Vegas in October, 1990—just prior to settlement—Figgie introduced what it hailed as a new product, the E–Z Flo Regulator. Mr. Almqvist, President of Interspiro, saw the E–Z Flo and inquired whether it had been designed around the '145 patent. Mr. Giorgini of Scott Aviation informed Mr. Almqvist that he assumed the invention would avoid the claims

of the '145 patent. Sometime in the fall of 1990, Figgie, through Scott Aviation, began selling the E–Z Flo Regulator. Mr. Almqvist attempted to obtain an E–Z Flo, but was unsuccessful.

In May, 1991, Interspiro conveyed all of its rights in the '145 patent, with the exception of those rights invested by the Settlement Agreement to Comasec, Inc., not a party to this suit. Interspiro subsequently changed its name to Pharos Protection USA, Inc. Also in May, 1991, Mr. Almqvist left the employ of Interspiro.

Sometime in 1991, Pharos began to suspect that Figgie was not making all payments as required by the Settlement Agreement; specifically, Pharos believed that Figgie was reporting a low "Weighted Average Sales Price," which serves as a basis for calculating royalty payments. On August 15, 1991, Mr. John Carney, President of Pharos, notified Figgie of Pharos' intention to exercise its right under the Settlement Agreement to conduct an audit of Scott.

During the audit in August or September, 1991, Pharos learned that Figgie had not paid royalties for sales of the E–Z Flo Regulator. It further discovered that in calculating the "Weighted Average Net Sales Price" of SCBAs (also a basis for royalty payments), Figgie had not included the price of an oxygen tank called the "Featherweight Cylinder"; instead, SCBAs sold with a Featherweight Cylinder were priced as if the SCBA had incorporated only a "Basic Cylinder."

The audit, however, was not completed. Mr. Nicholas Koppmann, Vice President and Controller of Scott Aviation, refused to supply the auditors with information concerning Scott Aviation's relationship with its distributors. Figgie also refused to verify which entities were Figgie affiliates or provide sales reports and invoices from its subsidiary, SSA, to SSA's customers, as well as other documents relating to the sales of E–Z Flo regulators. Finally, Figgie refused to supply an E–Z Flo regulator both to the auditor and to Mr. Carney.

Figgie contended that it did not have much of the information requested and also that it did not have sufficient control over Scott Aviation affiliates to obtain the information.

**1500**

Figgie further argued that invoices from SSA to its customers were not relevant to calculating royalties under the Settlement Agreement. When the auditors suggested a mass mailing to the distributors for the purpose of determining Figgie's equity share in each, Figgie refused to comply, claiming that the mailing would violate the confidentiality of the Agreement. Finally, Scott Aviation, through Mr. Koppmann, claimed that it could not provide an E–Z Flo Regulator because it did not have one on the premises; as a result, Mr. Koppmann recommended purchase from a Scott Aviation distributor. Mr. Koppmann did tell Pharos, though, that he would provide Pharos with an E–Z Flo if Pharos would first provide Figgie with an opinion on infringement.

On August 29, 1991, Pharos' counsel ordered an E–Z Flo Regulator from a distributor, which was received September 12, 1991.

On October 16, 1991, Pharos moved in this Court to enforce the settlement agreement. The major issues raised by this motion are: 1) Does this Court have jurisdiction to enforce the Settlement Agreement? 2) Is the E–Z Flo a "new product" and thus not covered by the royalty provisions of the Settlement Agreement? 3) Assuming the E–Z Flo Regulator is a payment bearing regulator—and not a new product—if it falls within the scope of the '145 patent, does the E–Z Flo Regulator fall within the scope of that patent? 4) By replacing the price of Featherweight Cylinders with the price of Basic Cylinders did Figgie properly calculate the Weighted Average Sales Price for the purposes of calculating royalties? 5) Did Figgie act properly by paying royalties on sales from Figgie to SSA rather than paying royalties on sales from its subsidiary SSA to end-user customers? 6) Did Figgie properly comply with the 1991 audit? 7) Did Figgie fail to act in "good-faith" to comply with settlement agreement, thus requiring an award of attorneys' fees to Pharos?

DISCUSSION

I. Jurisdiction

■ Courts may retain jurisdiction to enforce settlement agreements in cases that were once properly before them. *Halderman v. Pennhurst State School and Hospi-*

*tal,* 901 F.2d 311, 317 (3d Cir.), *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990) (quoting *McCall–Bey v. Franzen,* 777 F.2d 1178, 1188 (7th Cir.1985)). Furthermore, by incorporating a settlement into an order of dismissal, a court may retain such jurisdiction. *Id.; Washington Hospital v. White,* 889 F.2d 1294, 1298–99 (3d Cir.1989) (stipulated order). Courts need not explicitly indicate a desire to retain jurisdiction:

> [Although] we have rejected the suggestion that federal judges have inherent power to enforce settlement agreements arising out of lawsuits that were once before them[,] ... we have expressed no doubt of the power of a district court to dismiss a lawsuit conditionally, retaining jurisdiction to effectuate terms of settlement agreed to by the parties. Nor do we think there is any magic form of words that the judge must intone in order to make the retention of jurisdiction effective. All that is necessary is that it be possible to infer that he did intend to retain jurisdiction—that he did not dismiss the case outright, thereby relinquishing jurisdiction.

*Halderman,* 901 F.2d at 317 (quoting *McCall–Bey,* 777 F.2d at 1188) (brackets as they appear in *Halderman* ).

■ In this case, the Court signed a Stipulated Order incorporating the Settlement Agreement, ¶ 13 of which in turn allowed the Court to retain jurisdiction over the Settlement Agreement for a period of two years. Figgie argues that the Court's action does not manifest an explicit intent to retain jurisdiction; consequently, the Court may assert jurisdiction only through its inherent power, which it argues the Court also lacks on the facts of this case.

Figgie misreads *Halderman,* which does not require courts to use explicit language in order to retain jurisdiction over settlements. Nevertheless, the Settlement Agreement, which was incorporated in the Order of Dismissal, does explicitly manifest an intent that the Court should retain jurisdiction over its enforcement. As in *Halderman, White,* and *McCall–Bey,* therefore, it is possible—and apparently peremptory in this case—to infer from the Order of Dismissal that the Court intended to retain jurisdiction over the Settlement Agreement.

■ Furthermore, the Settlement Agreement is enforceable by motion; a party with a grievance need not file a new complaint. *Hobbs & Co., Inc. v. American Investors Management*, 576 F.2d 29, 34–35 (3d Cir. 1978). Figgie argues that because a Motion to Enforce precludes Figgie from asserting certain defenses enumerated and preserved in ¶ 13 of the Settlement Agreement, a Motion to Enforce is improper. The Court has already ruled, however, that ¶ 13 preserves defenses concerning those disputes that do not arise from the Settlement Agreement and that Figgie consequently has waived those defenses for the purposes of this motion. Tr. of April 28, 1992, D.I. 191, at 6, 13. Putting aside the issue of which defenses are available to Figgie, Figgie does not appear to contest the notion that the Settlement Agreement may be enforced by motion.

II. Is the E–Z Flo a "new product" not covered by the Settlement Agreement?

The first and major substantive issue in this case is whether the E–Z Flo Regulator is covered by the terms of the Settlement Agreement. The Settlement Agreement does not specifically mention or name any regulator, including the Donning Switch, which is conceded to fall within the ambit of the Agreement. It clearly specifies, however, that "new products" are not covered: "[T]he parties do not waive any rights or claims that may arise with regard to any new product which Scott [Aviation] may develop or any defenses (including non-infringement and invalidity ...) the parties may otherwise have to such a claim." Settlement Agreement Paragraph 13, PX–1.

Pharos argues that a product is "new" within the meaning of ¶ 13 only if it falls outside the scope of the '145 patent. Consequently, Pharos further argues that the E–Z Flo Regulator falls within the scope of the '145 patent and is therefore not a new product excluded from the royalty provisions of the agreement. Figgie contends, on the other hand, that a new product "is a product that Scott [Aviation] has developed that has never been on the market before execution of the Settlement Agreement and which is dif-

ferent from the Donning Switch." Defendant's Post–Trial Brief, D.I. 225, at 57. A new product, therefore, might or might not infringe the '145 patent. Correspondingly, Figgie argues, because the E–Z Flo is different from the Donning Switch and was not on the market before the execution of the Settlement Agreement, it is a "new product." The Court first determines the meaning of the term "new product" and then turns, in Part III, to the question whether the E–Z Flo is, in fact, a new product.

Paragraph 14 of the Settlement Agreement provides that the Settlement Agreement should be "interpreted and construed under the internal substantive laws of the State of New York." The parties do not dispute that New York substantive law controls issues of contract interpretation in this case.

■ Under New York law, "[a] settlement agreement must be interpreted as any other contract." *Olympic Tower Assoc. v. City of New York*, 183 A.D.2d 406, 583 N.Y.S.2d 263, 264 (1992); *Rainbow v. Swisher*, 72 N.Y.2d 106, 531 N.Y.S.2d 775, 776, 527 N.E.2d 258, 259 (1988). Courts should generally give effect to the expressed intentions of the parties in entering into the agreements. *Care Travel Co. v. Pan American World Airways*, 944 F.2d 983, 987 (2d Cir.1991); *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 897–98, 305 N.E.2d 907, 909 (1973).

■ Courts should first look to the language of the agreement to determine intent. *Hartford*, 350 N.Y.S.2d at 898–99, 305 N.E.2d at 910. In this initial inquiry courts must determine whether the language of the agreement is unambiguous on its face. "Contract language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (quoting *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1283 (1978)) (brackets as they appeared in *Metropolitan Life*); *Care Travel*, 944 F.2d at 988 (Agree-

ment is unambiguous when it is capable of one meaning when viewed by "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology generally understood in the particular trade or business.") (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968)). Contract language is not ambiguous merely because the parties attribute to it differing interpretations; nor is it ambiguous where one party urges an interpretation that strains the language beyond its ordinary meaning. *Id.* (quoting *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957)). If the language of an agreement is unambiguous on its face, the parties' rights under the agreement should be determined solely by the terms in the agreement. *Care Travel*, 944 F.2d at 987–88 (quoting *Metropolitan Life*, 906 F.2d at 889). Evidence concerning the commercial environment giving context to the agreement may be used to ascertain the parties' intent, however, even if the language of the contract is unambiguous. *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1046 (5th Cir.1971); *In re Rudolph's Will*, 123 N.Y.S.2d 731, 733–34 (Supr.Ct.1953). If the agreement is ambiguous on its face, courts may ascertain its meaning with the aid of parol evidence. *Care Travel*, 944 F.2d at 988.

▮ The term "new product" is not defined in the Settlement Agreement. Its meaning on its face or in the context of the Settlement Agreement is not self-evident. Figgie's contention that the plain meaning of the term is "a product that [was not] on the market before execution of the Settlement Agreement and which is different from the Donning Switch[,]" D.I. 225, at 57, only begs the question: What is different from the Donning Switch?

Additionally, each party's interpretation makes sense in light of other terms in the contract. Pharos highlights, for example, ¶ 1(a) of the agreement, which provides: "'Regulator' means a regulator valve, which, when combined with a mask would fall within the scope [of the '145 patent]." Accordingly,

as royalties are calculated from sales of "Regulators" (*see* ¶ 3), Pharos argues that a payment-bearing regulator—which could not logically be a new product—is one that falls within the scope of the '145 patent.

In contrast, Figgie contends that ¶ 13 and ¶ 1(a) should be read conjunctively, such that payment-bearing regulators: 1) cannot be a "new product" under ¶ 13; and, 2) must be a "regulator" under ¶ 1(a). In other words, not all "regulators" are payment-bearing regulators; some "regulators" are "new products." Furthermore, Figgie points out that if a "new product" must be non-infringing, then ¶ 13 makes no sense—why would the parties preserve defenses of non-infringement and invalidity only for products that do not infringe? Under the plaintiff's interpretation of "new product," Figgie argues, the Settlement Agreement forecloses all litigation over the '145 patent—either a product would or would not be a "regulator" for the purposes of the Settlement Agreement—and renders ¶ 13, which appears to relate to future litigation concerning the '145 patent, superfluous.

Both Pharos' and Figgie's interpretations are plausible viewed in light of the entire Settlement Agreement. Thus, the meaning of the term "new product" is ambiguous in the context of the Settlement Agreement, and the court will look in part to extrinsic evidence in determining its meaning.

[14] The Court finds that a "new product" is one that does not fall within the scope of the '145 patent. In so doing, the Court relies primarily on three factors. First, the Court believes that by defining a "regulator" as a device falling within the scope of the '145 patent, the parties appear to have manifested a strong intent that the scope of the patent should define the coverage of the Settlement Agreement's royalty provisions and indeed the scope of Settlement Agreement itself. Had the parties not intended to settle all litigation relating to the '145 patent, the parties likely would have limited the definition of "regulator" to include only the exact regulator depicted in the '145 patent and the Donning Switch.

Second, both Mr. Almqvist, Interspiro's former President, and Mr. Nicholas

Koppmann, Scott Aviation's Vice President and Controller, testified that a "new product" is one that falls within the scope of the '145 patent. While Mr. Koppmann later changed his testimony, the Court credits his initial testimony as well as the testimony of Mr. Almqvist. Finally, acceptance of Pharos' interpretation of "new product" does not render ¶ 13 superfluous. Paragraph 13 merely states the obvious: that the settlement would not affect litigation regarding any products not falling under the scope of the '145 patent. In sum, as it appears that the parties intended to settle all claims relating to products falling within the scope of the '145 patent and not just claims regarding the Donning Switch, the Court next must determine whether the E–Z Flo falls within the scope of the '145 patent.

■■■ In determining whether the E–Z Flo falls within the scope of the '145 patent and consequently is or is not a "new product," the Court need not address Figgie's arguments that the patent is invalid and unenforceable. First, the Court concludes that in signing the Settlement Agreement, Figgie waived its right to challenge the validity and enforceability of the patent with respect to issues arising under the Settlement Agreement in return for Pharos' waiver of the right to ask for treble damages for infringement. The Settlement Agreement effectively would be meaningless absent such a *quid pro quo*. Analogously, the Federal Circuit has held that in contempt proceedings, whether a new product infringes (thus giving rise to a finding of contempt) may not be challenged on the basis of invalidity of the patent. *KSM Fastening Systems, Inc. v. H.A. Jones Company, Inc.*, 776 F.2d 1522, 1529 (Fed.Cir. 1985). In that spirit, Figgie admits that if the E–Z Flo is not a "new product," then it has indeed waived the invalidity and unenforceability defenses. *See* Defendant's Post-Trial Brief, D.I. 225, at 55. Based on the Court's ultimate conclusion that the E–Z Flo is not a "new product," therefore, Figgie has waived its invalidity and unenforceability defenses with respect to this case.

III. Does the E–Z Flo fall within the scope of the '145 patent?

If the E–Z Flo Regulator falls within the scope of the '145 patent it is not a "new product" and is therefore a payment-bearing regulator under the Settlement Agreement. Claim 1 of the '145 patent (the only claim asserted) claims:

A respirator mask comprising:

a housing including an exhalation chamber having an exhaust outlet, and an inlet chamber forming a breathing space and having passage means adapted to communicate with a user's respiratory organs; a normally closed inlet valve connected to said inlet changer for supplying a source of breathing air to the inlet chamber to provide pressure therein; means for establishing a gauge pressure in said inlet chamber including a movable member mounted in said housing and separating said inlet chamber from said movable member toward said inlet chamber, means operatively associated with said movable member for actuating said inlet valve to supply pressure to said inlet chamber when said movable member is moved into said inlet chamber and for releasing pressure from said inlet chamber to said exhaust outlet when said movable member is moved into said exhalation chamber a predetermined distance wherein a gauge pressure is established and released in said inlet chamber in response to movement of said movable member; and detent means mounted in said housing for moving and maintaining said movable member toward said exhalation chamber against said biasing means whereby said inlet valve means is maintained in its closed position, said detent means including means for releasing said movable member in response to a user's inhalation effort in said inlet chamber whereby said inlet valve opens and said gauge pressure is reestablished.

■■■ The Court's inquiry must proceed in two steps. First, the Court must determine the scope of the claims at issue. *Autogiro Co. of America v. U.S.*, 384 F.2d 391, 401, 181 Ct.Cl. 55 (1967). The construction of the claims and their scope is a question of law. *Senmed, Inc. v. Richard–Allan Medical Industries, Inc.*, 888 F.2d 815 (Fed. Cir.1989). Nonetheless, the meaning of

claim language may turn on underlying issues of fact. *Perini Am., Inc. v. Paper Converting Mach. Co.,* 832 F.2d 581, 584 (Fed.Cir.1987). An issue of fact as to the meaning of a term exists where there is a genuine evidentiary conflict over the term's meaning. *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1579 (Fed.Cir.1989). Claim language should be interpreted as one reasonably skilled in the art would have interpreted the claim at the time of the invention. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985); *Mobil Oil Corp. v. Amoco Chemicals Corp.,* 779 F.Supp. 1429, 1442 (D.Del.1991).

 Once the Court determines the scope of the claims, it must determine whether the accused product infringes them. *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985). The claims may read on the accused product either literally or under the doctrine of equivalents. If the accused product does not literally infringe, infringement under the doctrine of equivalents may nevertheless occur if the accused product performs substantially the same function, in the same manner, to obtain substantially the same result as the claimed invention. *Graver Tank & Manufacturing Co., Inc. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). Infringement is a question of fact. *Palumbo,* 762 F.2d at 974; *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 936 (Fed.Cir.1987) (in banc).

A. *Literal infringement*

 Claim 1 of the '145 patent contains "means plus function" language. The claim describes, for example, a "detent" (means) "for moving and maintaining said movable member...." (function). Interpretation of claims with means plus function language is governed by 35 U.S.C. § 112, paragraph 6:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof.

Thus, "to meet a means-plus-function limitation literally, an accused device must (1) perform the identical function claimed for the means element, and (2) perform that function using the structure disclosed in the specification or an equivalent structure." *Intel Corp. v. United States International Trade Commission,* 946 F.2d 821, 841 (Fed.Cir.1991). Equivalence under § 112, paragraph 6 is different from equivalence under the doctrine of equivalents:

[T]he word "equivalent" in § 112 should not be confused ... with the "doctrine of equivalents." In applying the doctrine of equivalents, the fact finder must determine the range of equivalents to which the claimed invention is entitled, in light of the prosecution history, the pioneer-nonpioneer status of the invention, and the prior art. It must then be determined whether the entirety of the accused device or process is so "substantially the same thing, used in substantially the same way, to achieve substantially the same result" as to fall within the range. [*Graver Tank,* 339 U.S. at 610, 70 S.Ct. at 857.] In applying the "means plus function" paragraph of § 112, however, the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function.

*D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1575 (Fed.Cir.1985). Section 112 is not designed, however, to expand the coverage of means-plus-function language, but rather to restrict its coverage to truly identical means and functions. *See Valmont Industries, Inc. v. Reinke Manufacturing Co.,* 983 F.2d 1039, 1042 (Fed.Cir.1993) ("Section 112 permits means-plus-function language in a combination claim, but with a "string attached." The "attached string" limits the applicant to the structure, material, or acts disclosed in the specification and their equivalents. Indeed, the section operates more like the reverse doctrine of equivalents because it restricts the coverage of literal claim language.... In sum, for a means-plus-function limitation to read on an accused device, the accused device must employ means identical to or the

equivalent of the structures, material or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims.")

<span style="background:black"> </span> Prior art need not be considered in applying section 112, paragraph 6; correspondingly, a means-plus-function claim should not be limited by prior art. *Intel,* 946 F.2d at 842. Nevertheless, in construing a means plus function claim courts may consider the same interpretive aids they would consider in construing ordinary claims; those aids include the language of the claim(s), the specification, the prosecution history, other claims in the patent, and expert testimony on how those skilled in the art would interpret the claims. *Id.* at 843; *Palumbo,* 762 F.2d at 975; *see also Loctite Corp. v. Ultraseal,* 781 F.2d 861, 867 (Fed.Cir.1985).

There are two means plus function clauses in Claim 1 at issue: 1) "means for establishing a gauge pressure ..."; and, 2) "detent means ... for moving and maintaining [the] movable member...." In the former case, only the means is disputed. In the latter case, both means and function are at issue; however, the function issue is paramount.

### 1. *"means for establishing gauge pressure ..."*

Claim 1 of the '145 patent claims a means for establishing positive pressure, including several component means:

> means for establishing a gauge pressure in said inlet chamber including a movable member mounted in said housing and separating said inlet chamber from said movable member toward said inlet chamber, means operatively associated with said movable member for actuating said inlet valve to supply pressure to said inlet chamber when said movable member is moved into said inlet chamber and for releasing pressure from said inlet chamber to said exhaust outlet when said movable member is moved into said exhalation chamber a predetermined distance wherein a gauge pressure is established and released in said inlet chamber in response to movement of said movable member.....

Three of the component means claimed give rise to § 112, paragraph 6 issues in this case.

These means are the movable member, the biasing means, and the means for releasing gauge pressure.

#### a. movable member

According to claim 1, the means for establishing positive pressure includes a "movable member." In the patent specification, the movable member includes a "pressure chamber." In this section, the Court initially considers whether the pressure chamber is a required means, *i.e.,* whether the movable member must be a pressure chamber, and then considers whether the resulting claimed means, the movable member, is equivalent to the corresponding means in the E–Z Flo.

##### i. *Is the pressure chamber a required means?*

<span style="background:black"> </span> On the drawing of the '145 device (Figure 1 of the specification, shown *supra* ), the pressure chamber can be seen as an area (8), between two discs (12) and (13). A ring of flexible rubber (referred to as the diaphragm (7)), attached to the edges of the discs and to the housing of the regulator allows the two discs to move back and forth within the housing. The disc toward the bottom of the diagram (12) is perforated so that exhaled gases may, when necessary, escape from the regulator. A disc-shaped valve (15) on the portion of disc (12) facing toward disc (13) (and away from the inhalation port (9)), allows exhaled gases to move through the perforations at the appropriate time.

The E–Z Flo concededly does not have a pressure chamber.

Figgie argues that a pressure chamber, as shown in the specification, is necessary for establishing positive pressure in the invention in the '145 patent. To support this argument, Figgie points principally to two factors: the language and disclosures of the patent specification, and the prosecution history.

First, recalling the second *Intel* factor, Figgie creates a syllogism: Because the specification contains a pressure chamber, and because the pressure chamber is an integral part of the "movable member" which performs the function of establishing gauge

pressure, the claim cannot read on devices lacking a pressure chamber. The E–Z Flo has a diaphragm which does not serve the same functions as a pressure chamber.

It is true that the pressure chamber is a part of the "movable member," and it is also true that the diaphragm in the E–Z Flo does not serve all of the functions of the pressure chamber. These facts are, however, irrelevant. What is important is whether a pressure chamber is required by the patent to perform the specified function of establishing positive pressure. To speak to this issue, among others, Pharos offered the expert testimony of Dr. Gordon Moskowitz, a professor of mechanical engineering who has conducted research on various types of breathing respirators, published numerous articles in the field of breathing apparatus, and has designed and developed breathing respirators for the National Institutes of Health and the National Science Foundation. PX–63; Transcript of Hearing, D.I.s 219–221 ("Tr.") at 84–85. The evidence, as adduced by Dr. Moskowitz, whose testimony the Court credits, demonstrates that the pressure chamber is not required for the establishment of positive pressure in the mask. Tr. 168.

The pressure chamber is merely a part of a structure (or type of a structure)—the movable member—which performs the function of establishing positive pressure. The pressure chamber, essentially the movable member, accomplishes this result by moving back and forth according to a user's inhalation and exhalation, releasing the detent mechanism at the appropriate time, thereby opening and closing a valve connected to the pressurized oxygen. There has been no showing that a pressure chamber is intrinsic to the performance of these tasks.

The pressure chamber, in addition to being a movable member, serves other, safety related functions (principally through the operation of the exhalation valve (15), and through the existence of a double walled structure separating the inhalation area from the exhaust port). These safety related functions indisputably are not, however, the subject matter of claim 1 of the '145 patent; they have no relationship to the establishment of positive pressure. Nor does the claim or specification allude to any other reason suggesting that the movable member must be a pressure chamber. Thus, the fact that the '145 patent specifies a movable member in the form of a pressure chamber is merely fortuitous; the existence of a pressure chamber vis-a-vis some other movable member is unimportant in light of the functions claim 1 requires a movable member to perform.

Second, Figgie argues that the prosecution history demonstrates that a pressure chamber is a requirement of the claims in the '145 patent. Specifically, Figgie asserts that although the Patent Examiner deleted the reference in Claim 1 to "pressure chamber" and substituted the phrase "movable member," he did not indicate that a pressure chamber was not necessary to distinguish the invention of the '145 patent over the prior art. The applicants for the patent had argued that a pressure chamber distinguished the invention over the prior art.

The evidence not only belies Figgie's argument, but also lends support to the conclusion, reached above, that the pressure chamber is not necessary for establishing positive pressure. Figgie has proffered no evidence that the Patent Examiner considered the pressure chamber as an improvement over the prior art. In fact, the Patent Examiner apparently had concluded that the pressure chamber was not a distinguishing feature, and, more importantly, not necessary to the establishment of positive pressure. In deleting the reference to the pressure chamber in the original claim, the Patent Examiner remarked:

> The claim, as amended, now defines the structure of the valve necessary for establishing a gauge pressure therein and which includes a "detent means" releasable in response to an inhalation effort. Such combination structure patentably distinguishes over the prior art references of record.

Patent Examiner's Statement of Reasons for Allowance, PX–33.

In sum, both the specification and prosecution history demonstrate that the movable member taking the form a pressure chamber

is merely the "preferred embodiment" of the invention in the '145 patent; therefore, the movable member need not be a pressure chamber.

ii. *comparison of the "movable member" with the corresponding structure in the E–Z Flo*

■ As the Court has determined that the movable member need not be a pressure chamber, it must consider whether the claimed "movable member" is equivalent to the corresponding means in the E–Z Flo.

The Court concludes that the "movable member" of the '145 patent—whether or not in the form of a pressure chamber—and the diaphragm of the E–Z Flo Regulator are equivalent structures. Most important, the movable member of the '145 device and the diaphragm of the E–Z Flo each consist of the same basic elements or substructures. Each consists of a rubber disc(s) lined around its perimeter with a flexible ring which is in turn attached to the housing. Each contains some opening for the escape of waste gases from one side of the movable member/diaphragm to the other, and some means for closing those openings at appropriate times (the valves in each case are normally closed). Each has a coil spring biasing means.

Additionally, the movable members in both the invention of the '145 patent and the E–Z Flo accomplish the same result in the same way, *i.e.* they perform the same function in way that further demonstrates their structural equivalence. The diaphragm in the E–Z Flo establishes positive pressure just as the movable member in the '145 device does by moving back and forth with the user's breathing, releasing a detent means (*see infra*) at the appropriate time, to open and close the valve allowing the mask to pressurize.

In finding that the structures are equivalent, the Court again credits the testimony of Dr. Moskowitz. Tr. at 123–24.

b. "biasing means"

■ The biasing means is the second means of Claim 1 that must be compared with its corresponding structure in the E–Z Flo and is shown in the specification as a coil spring (19) that is attached to the housing and bears against the movable member. Figgie asserts that as the biasing means of the E–Z Flo does not bear against the movable member; that compared to the claimed means it performs different functions in different ways.

The Court does not accept Figgie's argument. First, the patent requires only that the biasing means bias the movable member toward the inlet chamber. The biasing spring of the E–Z Flo performs this function. Second, the biasing means of both devices perform that function in the same way. In the E–Z Flo, the biasing spring does not directly bear upon the diaphragm; instead it bears on the arm of the latching lever which abuts on the diaphragm. The Courts finds this difference to be immaterial; the fact that the latching lever of the E–Z Flo is interposed between the biasing spring and the diaphragm appears to be of incidental importance. The fact remains that each spring applies force directed against the movable member/diaphragm, thereby operating in the same fashion.

c. "means for releasing gauge pressure"

■ The final means to be compared under § 112 is that for "releasing gauge pressure."

The "means for releasing gauge pressure ..." refers to the means by which the patented device allows exhaled gases to flow from the inhalation chamber to the exhalation chamber on the other side of the movable member, and ultimately out of the regulator. Figgie claims that the patent and the E–Z Flo employ different means to accomplish the function of releasing gauge pressure.

In the patented device, gauge pressure is released (and exhaled gases allowed to escape) when the movable member moves a predetermined distance toward the exhalation chamber, whereupon a lug (17), located on the periphery of the housing, causes the two discs of the movable member to separate so that gas may pass from the inhalation chamber to the exhalation chamber. Figgie denies that the lug is the releasing means, contending that it is instead the exhalation

valve (15). The testimony of Dr. Moskowitz, which the Court credits, flatly contradicts Figgie's assertion. He noted that the releasing means in the patent is the lug. Tr. at 151–52. Consequently, the releasing means are equivalent, as the E–Z Flo also makes use of a lug which causes the discs of the diaphragm to separate and allow air to flow from the inlet chamber to the exhalation chamber.

### 2. *"detent means . . . for moving and maintaining [the] movable member . . ."*

Finally, Claim 1 of the '145 patent claims a detent means mounted in said housing for moving and maintaining said movable member toward said exhalation chamber against said biasing means whereby said inlet valve means is maintained in its closed position, said detent means including means for releasing said movable member in response to a user's inhalation effort in said inlet chamber whereby said inlet valve opens and said gauge pressure is re-established.

The parties dispute whether the E–Z Flo has a "detent means;" assuming it does, whether the detent means includes a means for "releasing said movable member. . . ."; and, finally, whether the "detent means" (latching lever) of the E–Z Flo performs each of the main functions described in Claim 1: "moving and maintaining said movable member . . ."

#### a. detent means

■ As noted above, Claim 1 requires a "detent means." Figgie contends that the E–Z Flo Regulator does not employ a "detent," but rather a "latching lever." Relying on the testimony of Mr. Eugene Giorgini, Scott Aviation's Health and Safety Division Engineering Manager, and Mr. George Vande Sande, the attorney who prosecuted the '145 patent, Figgie would define a detent as a "spring-backed ball device." Mr. Giorgini testified, for example:

> [A] detent is . . . a device made by the [Vlier] Ball Plunger Company . . . in which they had a set screw, which one end was hollowed out, a spring was dropped into that recess, a ball was pushed onto the

spring. And the end of the set screw was swaged.

Tr. at 315. Figgie further argues that because the spring-backed-ball detent is the only detent disclosed in the patent, under § 112 ¶ 6 the "spring-backed-ball" definition must be recognized as controlling even if there are other definitions of "detent."

The term "detent" is not defined anywhere in the patent. It has, however, an ordinary and plain meaning. The McGraw–Hill Dictionary of Scientific and Technical Terms defines a detent as: "A catch or lever in a mechanism which initiates or locks movement of a part, especially escapement mechanisms." Tr. at 349. The Court does not credit the testimonies of Mr. Giorgini and Mr. Vande Sande to the extent they conflict with that definition, and credits the testimony of Dr. Moskowitz, which is consistent with that definition: "[A] detent in a general sense is a stop or catch that can be applied in a mechanism such that [after removing a "cap"], it stops . . . motion, and [after removing the catch], there is an immediate movement of the mechanism." Tr. at 125. The parties do not appear to dispute that this definition describes each of the mechanisms at issue.

The specification, while not defining the term detent, describes a detent as comprising a bail, or lever, and a catch:

> This detent device comprises a slightly springy steel wire bail . . . which has a straight central section . . . which in the engaged position . . . bears against the arm.
>
> . . . .
>
> [T]he catch . . . consists of a sprung arm bearing against the wall of a unit . . . and fitted at its free end, on the side facing the wall, with a boss . . . which, when the catch is on, slips into a recess provided for it in the wall of a unit.

Thus, the specification describes a detent which conforms with the ordinary definition of a detent. It describes, however, a specific type of detent; therefore, the court must determine whether the detent described in the '145 patent and the "latching lever" of the E–Z Flo Regulator are the same or

equivalent structures. As the patent claim uses the term "detent," its meaning guides the inquiry.

As noted above, the patent specification describes a detent as consisting of two basic components: a lever and a catch. While the specification describes each component in more detail, it is the lever and catch structure, used in combination with a spring, that enables the detent described in the patent to perform its function. (The functions are described in detail *infra.*) In general, the catch allows the detent, and hence the regulator, to remain in the off position, the lever releases the catch upon inhalation, and the spring tends to drive the lever to release the catch upon inhalation.

The "latching lever" of the E–Z Flo is the equivalent of the detent in the '145 invention. As an initial matter, each is a detent under the plain meaning of the term. Additionally, the "latching lever" has the same basic components, a lever and a latch, that perform the same basic functions as the '145 detent. Moreover, both the "latching lever" and '145 patent's detent are activated by springs. The "latching lever" does not have a separate spring for this purpose (as does the detent in the '145 patent); instead, the biasing spring acts upon the latching lever in addition to its other functions. Figgie has not shown, however, that this difference has any functional importance. *Compare Radio Steel & Manufacturing Company v. MTD Products, Inc.,* 731 F.2d 840, 848 (Fed.Cir.1984) (in a means plus function claim, where an accused structure performs a function disclosed in the patent and also performs additional functions not performed by the relevant structure in the specification, the two structures may be equivalent for the purposes of § 112 ¶ 6). In that light, Dr. Moskowitz, whose testimony the Court credits, and Mr. Replogle each described the "latching lever" as a detent. PX–58, p. 3. Finally, while the question of whether the E–Z Flo infringes the '145 patent does not turn on whether the mechanism in the E–Z Flo should be labelled a "detent" or a "latching lever," the fact that the original drawings of the E–Z Flo describe the "latching lever" as a "detent" further supports a conclusion that the '145 detent and the "latching lever" are equivalent structures; it demonstrates that Figgie too conceptualized the mechanisms as substantially similar.

b. "for releasing the movable member in response to inhalation"

Claim 1 of the '145 patent requires a detent which includes "means for releasing the movable member in response to inhalation." Figgie argues that the valve retainer, which is attached to the diaphragm, and not the detent, is the release mechanism for the "latching lever." Figgie's argument in this regard borders on sophistry.

The valve retainer is attached to the diaphragm of the E–Z Flo. Upon a user's first inhalation, the diaphragm, and therefore the valve retainer, moves down. As it moves downward, the valve retainer encounters the latching lever and pulls it out of the latched position. The valve retainer could not unlatch the latching lever, however, unless the latch itself were designed to release. As a result, the latching lever is designed with a small flexible catch that dislodges when the latching lever is pulled downward. Thus, the latching lever includes a means for releasing the movable member embodied in the small flexible catch. The detent of the '145 patent has a corresponding mechanism, a catch (not shown on the illustration of the '145 device in the FACTS, *supra*), that operates similarly.

c. "for moving and maintaining the movable member"

The detent means performs two general functions according to the claim in the '145 patent. The first function is to "mov[e] and maintain[ ] [the] movable member toward [the] exhalation chamber against [the] biasing means [such that the] inlet valve means is maintained in its closed position...." As such, the detent must perform three subfunctions. They are: 1) moving the movable member toward the exhalation chamber against the biasing means; 2) maintaining the movable member against the biasing means; and, 3) in performing the second subfunction, maintaining the inlet valve in the closed position. (Figgie would add two more functions: moving the movable member toward the exhalation chamber and maintaining the movable member toward the exhala-

tion chamber. These functions are, however, redundant.) Additionally, in performing those functions, the detent automatically reestablishes positive pressure.

### i. *moving the movable member*

In the '145 patent's invention, the detent mechanism is located on the inhalation chamber side of the movable member (a diaphragm or pressure chamber). Upon manual activation, it moves the movable member toward the exhalation chamber against the biasing means by physically pushing it in that direction. The lever rotates upward and bears on the inlet valve actuating arm, which in turn rotates upward toward the exhalation chamber until the end of the actuating arm abuts the movable member, at which point it continues to rotate upward, pushing the movable member upward. (While the mask is being used, as the movable member moves toward the exhalation chamber, the biasing spring compresses so that when exhalation is complete the biasing spring will decompress and push the movable member back toward the inhalation chamber. *See* FACTS, *supra.*) The detent lever moves in this way only upon manual activation. Once a user releases the detent, it does not move.

The latching lever also moves toward the exhalation chamber; however, because the "latching lever" detent is located on the exhalation side of the movable member, it does not push the movable member toward the exhalation chamber. Instead, as it rotates toward the exhalation chamber, it compresses the biasing spring such that it no longer forces the diaphragm away from the exhalation chamber. As the latching lever removes all forces pushing the diaphragm away from the exhalation chamber, the forces tending to push the diaphragm toward the exhalation chamber become unopposed, causing the diaphragm to move in that direction. Positive pressure and the demand valve spring, which forces a diaphragm lever to push the diaphragm in much the same fashion as the detent lever pushes the movable member on the '145 invention, provide the forces tending to push the diaphragm toward the exhalation chamber. Furthermore, as the latching lever is in permanent

contact with the biasing spring, when the user is wearing the mask and the latching lever has been deactivated (unlatched), the latching lever moves back and forth with the movable member.

Figgie argues, principally, that because the latching lever of the E–Z Flo does not pull or push the diaphragm toward the exhalation chamber against the biasing spring, but rather allows the diaphragm to move in that direction, the latching lever does not "move" the diaphragm. The Court finds, however, that the latching lever does indeed move the diaphragm.

First, the Court credits the testimony of Dr. Moskowitz, who testified as follows:

Q. So the [latching] lever changes the forces acting on the movable member [in the E–Z Flo]?

A. Yes. The way to describe these mechanisms or the movement of this movable member is rather than to isolate a single force or a single element operating on the movable member, is to look at this as a— its motion as an effect of a combination of forces, which are applied to it both in terms of breathing, as well as the force of this spring driving the lever arm, as well as the force exerted, perhaps, outside by depression of the detent, as well as the effect of the biasing means.

In other words, the way I have described it at times, is that there is a concomitant of forces here that the result of which can move the movable member in whichever direction is appropriate, in response to whatever it is that has to be done, either shutting off the respirator or just providing demand regulation.

Tr. at 130–31. The "concomitant of forces" to which Dr. Moskowitz referred translates to the axiom that the position of any object is determined by the balance of all of the forces acting upon the object. The object moves when that balance is changed, either by addition or removal of a force acting upon the object. Thus, the upshot of Dr. Moskowitz' testimony is that it makes no difference whether something is moved by exerting a force upon it, or removing force that already acts upon it. In crediting Dr. Moskowitz' testimony in this regard, however, the Court

need not find that there is no important difference between removing and exerting a force upon an object. The Court merely finds that the difference, if any, is unimportant in this case.

Even though the latching lever acts by removing forces that act upon the diaphragm, it acts in a remarkably similar way to the detent in the '145 invention. Instead of moving the diaphragm by pushing it against the biasing spring, it moves the diaphragm by pushing the biasing spring directly. When the biasing spring is compressed, the diaphragm immediately moves toward the exhalation chamber. Consequently, although the diaphragm of the E–Z Flo does not supply the direct force against the biasing spring, it nevertheless moves against it through the action of the latching lever detent. Mr. Giorgini, Scott's Health and Safety Division Engineering Manager, testified at trial accordingly, agreeing that "when you push the button [on the latching lever], the result is that the movable member moves up." Tr. 366. Thus, in both the '145 patent and in the accused device the detent performs work against the biasing spring with the consequence that the movable member immediately moves.

### ii. *maintaining the movable member*

Figgie's argument that the E–Z Flo latching lever does not maintain the diaphragm against the biasing means recapitulates the argument Figgie submitted regarding the movement of the diaphragm in conjunction with the latching lever. The former argument fails for the same reason the latter does. When the detent of the '145 invention latches into place after it has fully rotated upward and moved the movable member, it locks the movable member into place by compressing it against the biasing spring. Similarly, when the latching lever latches into place after it has fully rotated upward and moved the diaphragm, it maintains the movable member toward the exhalation chamber by fully compressing the biasing spring such that the remaining forces acting on the diaphragm (from the demand valve spring and any positive pressure) hold it in place. Again, it is of no moment that the diaphragm of the E–Z Flo is maintained in its place by

removing a force acting upon it, rather than by exerting a force upon it.

### iii. *maintaining the inlet valve in a closed position*

Figgie claims that because the latching lever does not touch the diaphragm in the shutoff mode, it does not maintain the inlet valve in a closed position. Whether or not the latching lever touches the diaphragm is irrelevant. As the Court concluded above that the latching lever maintains the movable member toward the exhalation chamber, and as maintenance of the movable member toward the exhalation chamber necessarily maintains the inlet valve in a closed position, the Court must also conclude that the latching lever too maintains the inlet valve in a closed position.

### iv. *automatic reestablishment of gauge pressure*

Figgie argues that because there is a slight delay in the E–Z Flo from the time that the diaphragm moves downward following the user's first inhalation to the time when the latching lever is released, the E–Z Flo does not automatically establish positive pressure. Figgie correctly points out that such a delay exists. The diaphragm must move toward the inhalation chamber a small distance before the valve retainer attached to the exhalation chamber side of the diaphragm contacts the latching lever and pulls it out of its latched position. The diaphragm then may move toward the inhalation chamber and consequently reestablish positive pressure.

That the motion of the diaphragm as it moves to establish positive pressure may be described in two phases does not mean that the establishment of positive pressure is not automatic. As such, there is no evidence that the E–Z Flo does not automatically establish gauge pressure; all evidence points to the contrary. Perhaps most important, Figgie advertises the E–Z Flo as an "automatic on/manual off" regulator. PX–70B; PX–27, at 2. Additionally, Figgie has offered no evidence that the E–Z Flo takes any more time to establish positive pressure than do regulators employing the '145 patent design.

**1512**

(The movable member of the '145 patent also must move a certain distance before positive pressure is established; a time delay must accompany that movement.)

■ In sum, Figgie's redesign effort consisted of moving the detent from one side of the movable member or diaphragm to the other. This is not an invention beyond the scope of the '145 patent—the detent still moves the diaphragm, maintains it in place, and maintains the inlet valve in a closed position. The patent does not require that the detent move and maintain the movable member by physically pushing it; it only requires that the detent move the movable member in a given direction against a biasing spring, and at some point maintain it in position. Figgie certainly had every right to design around the '145 patent, *see State Industries, Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236 (Fed.Cir.1985) ("One of the benefits of a patent system is its so-called "negative incentive" to "design around" a competitor's products. . . ."), but it did not do so. Finally, it is of no moment that in certain modes of operation—*e.g.,* exhalation, inhalation, free-flow—the E–Z Flo may not operate in a way that would infringe the '145 patent. It matters only that the accused device operate in an infringing way at some time; that is the case here.

**B.** *Doctrine of equivalents*

Even if a claim does not literally read on an accused device, the accused device may yet infringe under the doctrine of equivalents. Under the doctrine of equivalents, the scope of a patent claim includes devices that perform "substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

■ Figgie argues that the doctrine should not apply as this is not an infringement action. Apart from the fact Figgie cites no law to support this proposition, it does not make sense. The Court's task is to determine whether or not the scope of the patent covers the E–Z Flo, and scope of the patent is shaped in part by application of the doctrine of equivalents.

Figgie next argues that prosecution history estoppel precludes application of the doctrine of equivalents; however, if the doctrine must be applied in order for the E–Z Flo to fall within the scope of the patent, the E–Z Flo would be a "new product" within the meaning of ¶ 13. First, the Court has already determined that the prosecution history in no way limits the scope of the patent to cover only devices including a pressure chamber. *See* Part III.A.1.i. Second, Figgie offers no evidence to support the conclusion that any device not literally covered by the '145 patent is a "new product." The Court has already determined that a "new product" is one that does not fall within the scope of the '145 patent, literally or otherwise. Thus, assuming the Court's analysis of the literal infringement issue is incorrect, the doctrine of equivalents nevertheless may be applied in this case.

■ Just as the E–Z Flo Regulator literally infringes the '145 patent, it infringes the '145 patent under the doctrine of equivalents. The detailed factual discussion regarding literal infringement obviates the need for anything beyond a brief and elementary discussion of infringement by the doctrine of equivalents.

First, both the E–Z Flo Regulator and the device embodied in the '145 patent share the same function. Each is an automatic-on/manual-off regulator which ensures that the breathing mask always has positive pressure.

Second, the regulators each accomplish this task in the same way. Each regulator employs a detent means which allows a user to lock the regulator in the off position, and allows the regulator to unlock automatically upon inhalation. Each detent performs the locking function by latching and preventing the movable member from reestablishing positive pressure; each allows reestablishment of positive pressure by unlatching so as to fully free the movable member. The regulators and their detents each perform in this manner despite having detent mechanisms located on different sides of the movable member. *Compare Maxon v. Maxon Con-*

*struction Company*, 395 F.2d 330, 335 (6th Cir.1968) ("One may not avoid infringement by a mere change in position of an operable element when the operation and results achieved by the accused device are essentially the same as the patented device."). Dr. Moskowitz' testimony further affirms that the two devices operate in the same way and are essentially the same regulator. Tr. at 157–58.

Finally, the overall result obtained by a user of each device is the same. The user of each device is ensured that positive pressure always exists in his mask, that the regulator will instantly establish positive pressure on demand by inhalation, and will continue to supply positive pressure until the user affirmatively and intentionally acts to shut the regulator off.

## IV. Featherweight Cylinder

 Regulators generally are not sold separately; rather, they are usually sold as part of a package which includes the rest of the SCBA. The parties agreed, therefore, that Figgie would pay royalties on sales of each "Basic" SCBA as well as sales of individual regulators. *See* Settlement Agreement ¶ 3, PX–1. Paragraph 1(c) of the Settlement Agreement defines "Basic Self–Contained Breathing Apparatus" as follows:

> [E]ach "Basic Self–Contained Breathing Apparatus" shall be assumed only to include each of the following types of components currently required by NIOSH [National Institute of Occupational Safety and Health]: back frame and harness assembly; a mask face piece assembly with head harness assembly; cylinder and valve assembly; pressure reducer; high pressure hose and coupling assembly. Each Basic Self–Contained Breathing Apparatus shall not include any accessory or attachment which is not listed in the previous sentence.

After the Settlement Agreement went into effect, Figgie sold and paid royalties on SCBAs including two types of cylinders: standard and lightweight.

In the fall of 1990, Figgie began to sell the "Featherweight Cylinder" with many of its SCBAs. The Featherweight Cylinder is 8.25 lbs. lighter than the standard cylinder, and 3.75 lbs. lighter than the lightweight cylinder. It is the best cylinder Figgie offers and consequently sells at higher price than either of the other two types of cylinders. Upon the sale of each SCBA including a Featherweight Cylinder, however, Figgie did not pay a royalty to Pharos based on the increased cost of the Featherweight Cylinder. Instead, Figgie paid royalties on each SCBA sold with a Featherweight Cylinder as if it had been sold with a standard cylinder.

Pharos now complains that this practice violates the Settlement Agreement, arguing that the Featherweight Cylinder is a "type" of cylinder and valve assembly, and thus included within the definition of a Basic SCBA. Figgie contends, however, that the Featherweight Cylinder is merely an "accessory," and hence not part of a Basic SCBA. In response to Pharos' argument that the Featherweight Cylinder is a type of cylinder and valve assembly, Figgie analogizes the Featherweight Cylinder to leather seats in automobiles: "Leather seats are an automobile accessory even though automobiles have seats." Defendant's Proposed Findings of Fact and Conclusions of Law, D.I. 226, at 46. In other words, even if the Featherweight Cylinder is a type of cylinder, it comes with an accessory, lightness, which is not included in a Basic SCBA.

Figgie's analogy, however, does not hold. Even if lightness might be considered the "accessory," the Featherweight Cylinder is no less a *type* of cylinder and valve assembly covered by the Basic SCBA definition. Moreover, according to the Settlement Agreement, not all accessories are not included in a Basic SCBA; only those accessories not listed among the types of components defining a Basic SCBA fall outside the definition of the Basic SCBA. Thus, the list includes items that might otherwise be defined as accessories. In sum, the Settlement Agreement language is unambiguous: the Featherweight Cylinder is type of component required by NIOSH (the cylinder and valve assembly), and, because it is a "type of component," it cannot be an accessory not included in the list of components defining an SCBA.

Figgie's additional arguments in support of a contrary interpretation are even weaker. First, Figgie argues that because the Featherweight Cylinder was not required by NIOSH, it is not a component within the meaning of the Settlement Agreement. As already discussed, however, the Agreement mentions types of components required by NIOSH, not merely particular components required by NIOSH. Second, Figgie points to the facts that the Featherweight Cylinder is a significant improvement over previous cylinders, has its own customer demand, and is marketed separately; as a result, the market regards the Featherweight Cylinder as an accessory. Ignoring the fact that Figgie has produced no evidence concerning market perceptions, market perceptions are nevertheless irrelevant. Again, the Settlement Agreement defines accessories as things not listed among the types of components required by NIOSH. It does not define accessories in terms of quality, price, marketing situation, or market acceptance.

To the extent the language may be ambiguous, extrinsic factors further support Pharos' interpretation of the Settlement Agreement. Most important, the parties' course of dealing strongly suggests Figgie should have included and should include the price of the Featherweight Cylinders in the figures used to calculate royalties. The arguments Figgie proffers regarding the Featherweight Cylinder would appear equally to support the withholding of royalty payments on the entire sales cost of the lightweight cylinder, too, yet Figgie has always paid royalties on it as well as the standard cylinder. If the Court were to, accept Figgie's interpretation of the Settlement Agreement, it would create an unusual situation in which Pharos would receive a higher royalty for certain cheaper SCBAs—those including a lightweight cylinder—than other more expensive ones (those including a Featherweight Cylinder). If the lightweight cylinder must be included within a Basic SCBA, then the Featherweight Cylinder also must be so included.

Testimony presented at the hearing also supports the inclusion of Featherweight Cylinders as components within the definition of a Basic SCBA. Mr. Almqvist, whose testimony the Court credits, indicated that the parties intended that the prices of items such as Featherweight Cylinders be included in the calculation of royalty payments. Tr. at 52–53. He also testified that at the time of the Agreement Figgie sold several different cylinders, and that all were to have been covered by the royalty provisions of the Settlement Agreement. Mr. Koppmann, on the other hand, testified to the contrary; that under the Settlement Agreement, the price of the Featherweight Cylinder was not to be factored into the royalty calculations. Tr. 458. Because Mr. Koppmann was not a party to the settlement negotiations—he merely read drafts of the agreements and performed some calculations—the Court discredits his testimony. Tr. 392.

Finally, Figgie sales literature belies the argument that the Featherweight Cylinder is considered an accessory. Figgie's price list shows the Featherweight Cylinder as a component of five different SCBAs and is not included in the price section list marked "Accessories." PX–18. A Figgie sales brochure describes different types of SCBAs including standard, lightweight, and featherweight cylinders. PX–27, Tr. 456–67. It too fails to list the Featherweight Cylinder as an accessory; the accessory list includes items such as carrying cases and supply hoses.

V. Figgie's sales to unaffiliated entities—SSA's status under the Settlement Agreement

Figgie is a conglomerate of several divisions and subsidiaries, including Scott and SSA. Scott Aviation is a manufacturer and supplier of SCBAs. Scott Aviation sells SCBAs incorporating regulators to principally three types of customers. First, it sells some SCBAs to "end-users." End-users are the consumers of SCBAs, including, for example, firefighting companies. Scott Aviation's only significant end-user customer is the federal government (it is also Scott Aviation's biggest customer). Second, Scott Aviation sells some SCBAs to independent distributors, who in turn sell the SCBAs to end-users, or perhaps to other distributors. Finally, Scott Aviation sells or transfers some SCBAs to SSA, which is a conglomeration of

formerly independent distributors now owned by Figgie. SSA, like the independent distributors, sells to end-users. Not surprisingly, however, Scott Aviation charges SSA 25% less for SCBAs than it charges to the independent distributors.

The parties dispute how royalties should be calculated on sales through (to and/or from) SSA. Figgie has paid royalties based on sales from Scott Aviation to SSA. It calculates the royalties, however, as if an independent distributor had been invoiced for the sale—it substitutes the cheaper price billed to SSA for the more expensive price charged to independent distributors. Pharos argues that royalties should be calculated on the basis of sales from SSA to end-users rather than sales from Scott Aviation to SSA. In other words, Pharos argues that royalties should be calculated on each transaction in which an SCBA leaves the Figgie family, while Figgie maintains that royalties should be calculated on each transaction in which an SCBA is sold by Scott Aviation. Each party contends that its interpretation comports with the plain meaning of the Settlement Agreement.

Paragraph 1(f) of the Settlement Agreement provides that royalties shall be calculated based upon the weighted average net sales price of SCBAs "invoiced by Scott ... to Unaffiliated Customers." The terms "Scott" and "Unaffiliated Customer" are defined elsewhere in the Settlement Agreement. "Scott" is defined in the first paragraph of the agreement as, collectively, "Figgie International Inc., ... its parent, its divisions, its wholly or partly owned subsidiaries, and its wholly or partly owned affiliates...." Paragraphs 1(d) and 1(e) define the terms "Customer" and "Unaffiliated Customer," respectively:

1(d) "Customer" means the transferee for value (including any distributor) directly from Scott of a Regulator.

1(e) "Unaffiliated Customer" means any Customer in which Scott holds an equity interest of less than 35% of such Customer's total equity and which is not controlled by or under common control with Scott.

The parties appear to agree that these terms were negotiated to protect both Figgie

and Pharos from potential injustices. On one hand, as many end-users receive their Regulators and/or SCBAs from independent distributors, it would have been unfair to mark all sales to end-users, resulting in Figgie paying royalties based on others' sales and profits. On the other hand, as Figgie had been acquiring many distributors to whom it charges a lower price than it charges to independent distributors, it would have been unfair to calculate the royalty based on the price in the invoice to the distributor. Figgie could then minimize its royalty payments by acquiring distributors and slashing wholesale prices. Though the parties disagree as to exactly what compromise was reached, each party offers an interpretation that accommodates these concerns.

Pharos supports its position with a straightforward, syllogistic reading of the definitions of "Scott," "Customer," and "Unaffiliated Customer." First, because SSA is a wholly or partly owned subsidiary or affiliate of Figgie, it is a part of "Scott." Thus, when SSA buys or sells an SCBA, or in fact does anything, so does "Scott." Second, because the purchasers (usually end-users) who purchase from SSA are transferees for value from "Scott," and because the purchasers typically are not controlled by "Scott," those who purchase from SSA are "Unaffiliated Customers" under ¶¶ 1(d) and 1(e). Thus, under ¶ 1(f), an invoice from SSA to a typical purchaser is an invoice from Scott to an "Unaffiliated Customer" and must therefore be used as the basis for royalty calculations.

In contrast, Figgie argues that the term "Scott" often refers only to Scott Aviation and not the collective identity of Figgie, and that consequently the definition of "Unaffiliated Customer" includes only end-users who purchase directly from Scott Aviation (these end-users are the federal government) and independent distributors. In other words, end-users who purchase from SSA are not "Unaffiliated Customers" because they do not purchase from Scott Aviation and are not therefore "Customers." In short, Figgie suggests that a sale to SSA would be a sale to a "Customer" and would trigger a royalty payment under ¶ 3(b), which requires payments on Regulators invoiced by Scott; how-

ever, pursuant to ¶ 1(f), the payment would be made on the basis of an invoice to an "Unaffiliated Customer" such as an independent distributor. Thus, the disagreement between the parties is really one over the meaning of "Scott," as its meaning is critical to the meaning of the other important term, "Unaffiliated Customer."

In support of its argument, Figgie attacks the logic of Pharos' interpretation. It contends that if Pharos' position that the first buyer outside the Figgie/Scott organization is a customer—which follows directly from Pharos' interpretation of "Scott" in ¶ 1(d)—were correct, then the definition of "Unaffiliated Customer" would be rendered redundant, as all Customers—being outside the Figgie/Scott organization—necessarily would be Unaffiliated Customers. The Settlement Agreement refers at various times, however, to both "Customers" and "Unaffiliated Customers." Paragraph 1(f), for example uses each term ("Net Sales Price" is defined as "the net selling price actually invoiced by Scott to a Customer...."). Moreover, Figgie argues that Pharos' position would lead to another anomaly: Because ¶ 3(b) requires that a royalty is triggered on a sale to SSA, the use of an invoice from SSA to end-users to calculate the royalty would force Figgie to pay royalties on SCBAs before the royalty payment could be properly calculated. Given that there can be significant time lags between sales to SSA and subsequent sales from SSA, it would be impractical, if not impossible, to calculate royalties in the proper calendar quarter in which they are due.

Each interpretation appears to be at the very least plausible, although under either party's reading the Settlement Agreement is fraught with problems. On its face, the Settlement Agreement is ambiguous; hence, in order to choose an interpretation the Court will consider the language of the agreement in conjunction with extrinsic evidence, particularly the negotiating history.

The Court finds that the parties intended to mark sales from the Figgie family to entities outside the Figgie family rather than sales from Scott Aviation to its customers. On the face of the contract alone, while both parties offer plausible constructions, Pharos'

construction appears to make the most sense. First, the definition of "Scott" in the Settlement Agreement is clear. Paragraph 1(c) of the Agreement mentions Scott Aviation as part of Scott, yet nowhere in the settlement agreement is the term Scott Aviation used. The Agreement does not mention or hint at any alternative uses of the term "Scott." It would have been a simple matter to substitute the words, "Scott Aviation" at appropriate points.

Second, by adhering to the definition of "Scott" provided in the first paragraph of the agreement, the distinction between "Customers" and "Unaffiliated Customers" does not necessarily break down. Conceivably, "Scott" can sell a product to itself, as when Scott Aviation sells to SSA. As such, SSA would be a "Customer," but not an "Unaffiliated Customer." Undoubtedly, this interpretation of the Agreement leads to the awkward scenario in which a royalty would technically attach before it could be calculated. To some extent, such awkwardness is ameliorated by the contractual provision allowing Figgie to pay royalties some time after customers are invoiced. *See* Settlement Agreement, ¶ 5 (royalty payments due thirty days after the end of the quarter in which the royalty generating sale occurs). Nevertheless, interpreting the language of the agreement to effect a somewhat awkward scheme appears to do the language of the Agreement less injustice than obliterating the consistent application of a defined term.

Extrinsic factors also support Pharos' position. First, the negotiating history shows that "Scott" was a hotly negotiated term. The parties went through several drafts, each with different definitions of "Scott," before the final definition was arrived at. PXs 1–10. In support of its position regarding the definition of Scott, Figgie points to a letter which it claims reveals that Pharos understood that "Scott" could sometimes refer only to Scott Aviation. In that letter, which accompanied the Interspiro draft of July 25, 1989, containing the final definitions of "Scott," "Customer," and "Unaffiliated Customer," plaintiff's counsel wrote to the defendants:

Finally, I have included a signature line for an official of the Scott Division. Though I understand that the signature of an official of Figgie binds Scott, I believe that since Scott is implementing this agreement, it is useful to have Scott sign.

PX–5. The letter only demonstrates the obvious: that it is possible to use the word "Scott" to refer to Scott Aviation. This letter, moreover, implicitly signals that its use of the word "Scott" refers to the Scott Division (the Settlement Agreement contains no such signal). Thus, the letter is of no aid in interpreting the Settlement Agreement; it does nothing to show that any particular use of the term "Scott" in the Settlement Agreement refers, as the letter does, to Scott Aviation or the Scott Division.

Second, the negotiating history contains no indication that the term "Unaffiliated Customer" was meant to embrace only the federal government and independent distributors. Figgie's argument that the negotiating history supports its contention is wholly conclusory. Figgie merely notes, in that regard, that sales to both affiliated and unaffiliated customers were contemplated and that during negotiations both parties knew that Scott Aviation sold to both affiliated and unaffiliated distributors. However, such facts do not appear to be inconsistent with either Figgie's or Pharos' interpretation of the Settlement Agreement. Figgie further argues that the negotiating history does not indicate that the parties intended to calculate royalties based on prices to end-user customers of affiliated or unaffiliated distributors, but the negotiating history regarding the definition of "Scott," and by implication the definitions of "Customer" and "Unaffiliated Customer," belies that notion as well.

Finally, each party called witnesses to testify as to the meaning of the Settlement Agreement. Again, Figgie offered the testimony of Mr. Koppmann while Pharos offered the contradictory testimony of Mr. Almqvist. Tr. 397–98 (Koppmann); Tr. 61–62 (Almqvist). As only Mr. Almqvist participated in the settlement negotiations, and as Mr. Almqvist's testimony appeared to be more consistent with the evidence, the Court credits Mr. Almqvist's testimony that the parties intended to mark sales outside the Figgie family for the purposes of calculating royalties.

## VI. The Pharos Audit

Pharos next argues that Figgie breached the Settlement Agreement auditing provision, as well as the implied covenant of good-faith and fair dealing, in three ways: 1) by failing to provide the auditors with information concerning Figgie's ownership interest in its distributors; 2) by failing to supply auditors with information concerning SSA's sales to end users; and, 3) by failing to provide the auditor with information concerning the E–Z Flo and by failing to provide an E–Z Flo Regulator to Pharos itself on request. Figgie contends that it did not have a responsibility to provide any of that information and that in fact Pharos requested the audit merely to go on a fishing expedition.

Paragraph 6 of the Settlement Agreement contains the relevant auditing provision:

> With each [royalty] payment ... Scott shall provide a report to Interspiro explaining how the amount of the payment was calculated.... Scott shall be obligated to maintain accounting records and other documentation for two years after payment ... in order to permit an audit by a certified public accounting firm to be selected by Interspiro. The auditors shall not reveal to Interspiro, or any other entity, any of Scott's proprietary information. Any information obtained by the auditors from Scott, which Scott in good faith has designated to be proprietary, shall not be revealed to Interspiro unless approved by Scott. Scott shall not designate as proprietary its sales figures or prices, to the extent necessary to report or explain payments under paragraph 3, though there may be certain specific information about those sales figures or breakdowns of them that is proprietary. If Scott believes the information is proprietary, it will be Scott's obligation to supply alternative information that the auditors determine is satisfactory to consult with Interspiro to the extent required to perform their audit and advise Interspiro.

■ As an initial matter, the Court concludes that Pharos initiated the audit in good-faith. The Court credits the unrebutted testimony of Mr. Carney that he initiated the audit only after Mr. Almqvist had informed him that the "Weighted Average Price" used in calculating royalty payments seemed too low. Tr. at 203. As such, the Court considers whether Figgie acted properly in withholding the three types of information described above.

**A. *Figgie's failure to provide the auditors with information concerning Figgie's ownership interests in its distributors***

Figgie generally contends that the information concerning Figgie's ownership interest in its distributors was both proprietary and difficult to provide. First, Figgie argues that Figgie, rather than the auditors, had the right to determine what information was necessary to complete the audit. Figgie further submits that the first two sentences of the Settlement Agreement's audit provision, obligating Figgie to provide a report concerning royalties and to maintain accounting records and other documentation, entitled the auditors only to accounting records and a report.

■ The plain language of the Settlement Agreement belies Figgie's argument. The Settlement Agreement regulates only the flow of information to Interspiro, not to the auditors. It merely provides that if Figgie, in good-faith labels information as proprietary, then Interspiro shall not have access to that information through the auditors; however, when Figgie labels information proprietary, Figgie must provide the auditors with other information for the purposes of discussing the audit with Interspiro. Moreover, the Agreement specifically provides that in such cases the auditors shall determine what information is necessary to consult with Interspiro concerning the audit.

■ If the auditors are to determine what information is necessary to fairly discuss the audit with Interspiro, it would seem logical that the auditors are also entitled to determine what information is necessary to perform an audit worthy of discussing—especially as the Agreement does not provide Figgie with any right to control information

flow to the auditors. The testimony of Mr. Almqvist, which is unrebutted by contrary testimony from a person involved in the settlement negotiations, and which the Court credits, supports that conclusion. Tr. at 62–65. Moreover, the language of the first two sentences of ¶ 6 of the Settlement Agreement in no way limits the information to which an auditor would be entitled. Those sentences, particularly by requiring Figgie to maintain "other documentation," only reinforce the notion that the auditors were entitled to any information necessary to conduct an audit. Thus, to the extent Figgie fairly labeled the information concerning its distributors as confidential or proprietary, it nevertheless should have conveyed that information to the auditors.

■ Correspondingly, it was primarily for the auditors to determine what information would have been relevant to effectuate the Agreement. When asked for the information concerning its distributors, for example, Figgie argued that the information was irrelevant for the purposes of calculating royalties. Even if Figgie could have properly withheld irrelevant information, the Court's conclusions in Parts IV and V demonstrate that all of the information requested by the auditors was indeed relevant. In short, if Figgie has a right to withhold information under the Settlement Agreement, the right pertains only to information not reasonably necessary to the completion of the audit. To the extent the Agreement was unclear concerning revenue calculation, the auditors made reasonable requests to which Figgie should have responded.

■ Second, Figgie argues that because its distributors—whether or not affiliated with Figgie—are separate "profit centers," obtaining the relevant information from the distributors would have been impractical. When the auditors first asked Scott Aviation, which was implementing the Settlement Agreement on behalf of Figgie, for the information, Mr. Koppmann apparently offered to get the information from Figgie. According to Mr. Koppmann, after the auditors rejected this suggestion they suggested a mass mailing to each distributor asking each distribu-

tor to disclose Figgie's equity interest in it. (It remains unclear exactly what kinds of information Mr. Koppmann offered to obtain, and if, why, or to what extent the auditors rejected the initial offer to get the information from Figgie.) Mr. Koppmann suggested instead that the auditors request the information from the Secretary of State for each state in which a distributor was incorporated. He claimed Figgie did not have sufficient control over its distributors to acquire the information. He also claimed that such information was "confidential," though he never offered a supporting explanation.

The Court finds it hard to believe the proposition that Figgie did not have sufficient control over its distributors to obtain the information. At the very least, Figgie should have had little difficulty in acquiring such information from distributors in which Figgie owned some equity stake (such information alone might have been sufficiently conducive to the audit considering the auditors' goal of determining degree of control). As parties to the Settlement Agreement (see definition of "Scott" in Part V), any wholly or partly owned affiliate should have been willing to supply information conducive to the audit. Furthermore, the Court cannot say that the auditors' rejection of Mr. Koppmann's offer to get the information from Figgie to be unreasonable; it is entirely possible Figgie could not have provided sufficient verification. Finally, in light of the circumstances, Mr. Koppmann's second suggestion to the auditors, to contact state government for ownership information, appears to have been particularly impracticable and unreasonable.

In sum, the information requested appears to have been of the type Figgie could have obtained with minimal effort, and should have, in good-faith, supplied. Even if Figgie's readings of the substantive terms of the provisions bearing on royalties were made in good-faith, its efforts to stonewall the audit were not.

### B. *Figgie's failure to provide SSA's invoices*

Figgie argues that because it did not control SSA, it could not have obtained SSA's invoices or sales information. It also contends that the information was irrelevant for the purposes of royalty calculations. These arguments must fail for the same reasons the arguments in the preceding paragraphs (Part VI.A.) fail. The requested information was both relevant and easily obtainable; the auditors' request for the information was reasonable even if the Agreement was unclear. As SSA was a Figgie affiliate and a party to the Settlement Agreement, Figgie should have been able to obtain from SSA the relevant information.

### C. *Figgie's refusal to provide an E-Z Flo Regulator, or information concerning it, immediately upon request*

■■■ Figgie refused to supply an E-Z Flo and information pertaining to the E-Z Flo to both the auditors and Interspiro. With regard to the auditors' requests for sales information for the purposes of calculating revenues, the Court's conclusions in Parts V.A. and V.B. apply; Figgie should have provided it. On the other hand, as possession by the auditors of an E-Z Flo regulator does not appear to have been reasonably necessary to completion of the audit, Figgie did not act improperly by refusing to supply an E-Z Flo to the auditors. A final issue remains: whether Figgie had an explicit or implicit duty to supply an E-Z Flo to Interspiro upon its request.

■■■ When Mr. Carney asked Figgie to sell to Pharos an E-Z Flo Regulator, Mr. Koppmann cited two reasons for denying the request: 1) Scott Aviation did not have an E-Z Flo available; and, 2) Scott would provide an E-Z Flo only after Pharos informed Figgie of its position on infringement. Mr. Koppmann then suggested that Pharos obtain an E-Z Flo from a distributor. Pharos ordered an E-Z Flo from a distributor, and received it approximately two weeks later.

The Court concludes that Figgie's conduct was improper. Figgie appears to have had a duty to supply Pharos with an E-Z Flo Regulator. Pharos cannot fairly exercise its contractual right to audit Figgie without being allowed to examine products which could potentially fall within the scope of the agree-

ment and ultimately generate revenues for Pharos. As such, a good-faith implementation of the auditing provision would have required a reasonable attempt on Figgie's part to supply a regulator. Such a reasonable attempt was not made.

It also appears that Figgie's excuses for failing to sell Pharos an E–Z Flo Regulator were not acceptable. First, it seems highly unlikely that the producer of the E–Z Flo Regulator could not have immediately obtained one for sale and shipment. Second, it was unreasonable for Mr. Koppmann to condition Scott Aviation's sale of an E–Z Flo upon Pharos' tender of an infringement opinion on that very product. Mr. Koppmann could not reasonably have expected such an opinion from Pharos until Pharos had been given an opportunity to examine an E–Z Flo in the first place. Thus, Figgie breached the Settlement Agreement in failing to make a good-faith effort to supply Pharos with an E–Z Flo.

## VII. Attorneys' Fees

Finally, Pharos asks the Court to award to it attorneys' fees under 35 U.S.C. § 285 as a result of Figgie's bad-faith in implementing the Settlement Agreement. 35 U.S.C. § 285 provides:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party.

Pharos further notes that the Court retains, in addition to the powers conferred by the statute, inherent power to award attorneys' fees where litigation has been conducted in bad-faith. *See Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973). Figgie replies, however, that the attorneys' fees issue is controlled not by federal (patent) law, but by New York law. Under New York law, fees may only be awarded when authorized "by agreement between the parties or by statute or by court rule." *A.G. Ship Maintenance Corp. v. Lezak,* 69 N.Y.2d 1, 5, 511 N.Y.S.2d 216, 503 N.E.2d 681 (1986).

■ This case involves a contract dispute over a settlement agreement arising out of a case grounded in federal law and executed under the auspices of the federal courts. Thus, the basis of this Court's jurisdiction remains federal in nature—the case is based ultimately on a federal question. While pursuant to the agreement of the parties the substantive provisions of the contract must be interpreted under New York law, New York law cannot trump the powers this Court otherwise retains as accoutrements of its federal question jurisdiction. The attorneys' fees issue is clearly not one of contract interpretation; therefore, it is an issue to be decided under federal law. The Court also notes in passing that the Court's inherent fee-shifting powers appear to be procedural in nature; hence, the Court might well have been free to award fees even if the basis for jurisdiction in this case had been in diversity. *See Chambers v. NASCO, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2123, 2138, 115 L.Ed.2d 27, 51–52 (1991) ("We agree ... that '[w]e do not see how the district court's inherent power to tax fees for [bad faith] conduct can be made subservient to any state policy without transgressing the boundaries set out in *Erie,* [*R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ], *Guaranty Trust Co. [v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) ], and *Hanna [v. Plumer,* 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) ],' for '[f]ee-shifting here is not a matter of substantive remedy, but of vindicating judicial authority.' ") (quoting *NASCO, Inc. v. Calcasieu Television and Radio, Inc.,* 894 F.2d 696, 705 (5th Cir.1990)).

■ Figgie next argues that because Pharos no longer owns the patent in suit and because this is a contract action, 35 U.S.C. § 285 is unavailable to Pharos. Figgie cites four cases, *California Eastern Laboratories, Inc. v. Gould,* 896 F.2d 400, 403 (9th Cir. 1990), *Machinery Corp. of America v. Gullfiber AB,* 774 F.2d 467, 475 (Fed.Cir.1985), *Peterson Manufacturing Co. v. Central Purchasing Inc.,* 740 F.2d 1541, 1551 (Fed.Cir. 1984), and *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1564 (Fed.Cir.1983), for the proposition that § 285 applies only to infringement actions.

Figgie is correct that § 285 applies only to infringement actions. The definition of an infringement action for the purposes of § 285 is, however, fairly broad. The cases cited by

Figgie go on to say that § 285 should not be applied to shift fees regarding claims unrelated to patent law. In Gould, for example, "the alleged fraud [was] unconnected to any infringement claim." Gould, 896 F.2d at 403. In Gullfiber AB, in contrast, the Federal Circuit held that attorneys' fees may be assessed under § 285 for a tortious interference claim related to a patent infringement claim.

This case involves, at bottom, a patent claim. The breach of contract claims in this case are not merely connected or related to the patent claim; they arise from it. Just as § 285 was held to apply to a tortious interference claim in Gullfiber AB, it should apply to the breach of contract claims in this case.

■ In a final attempt to stave off the application of § 285, Figgie argues that an award under the statute must be grounded on a finding of willful infringement. See Bott v. Four Star Corp., 807 F.2d 1567, 1574 (Fed.Cir.1986); Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 657 (Fed.Cir.1985). The cases cited by Figgie do not contain any statements to that effect; rather, they note that attorneys' fees may be properly awarded following a finding of willful infringement.

■ As the statute states, the Court may award attorneys' fees to the prevailing party only in exceptional cases. An exceptional case is one in which it would be grossly unfair for the prevailing party to bear the cost of litigation, or where the conduct of the losing party is marked by bad-faith or unfairness. Gullfiber AB, 774 F.2d at 467 (quoting Park-in Theatres, Inc. v. Perkins, 190 F.2d 137, 142 (9th Cir.1951)). Correspondingly, in considering whether a case is exceptional, courts look to factors such as the "closeness of the case" and "the parties conduct and their trial counsel's tactics, including evidence of bad faith." Afros S.P.A. v. Krauss-Maffei Corp., 671 F.Supp. 1402 (D.Del.1987), aff'd, 848 F.2d 1244 (Fed.Cir.1988).

■ This is an exceptional case. First, the principle issue in this case—whether the E–Z Flo Regulator infringed the '145 patent and consequently was not a new product—was not close. The Court recognizes that the

patent law and system encourages designing around patented inventions; however, in this case, not only did Figgie fail to design around the '145 patent, it failed in a transparent, obvious way. The fact remains that Figgie merely switched the detent mechanism from one side of the diaphragm to other, accomplishing little if anything, and then attempted to exaggerate this minor change into a design innovation. It should have been abundantly clear to Figgie that it was producing an infringing device and improperly withholding royalty payments generated from its sales. This factor alone merits an award of fees and costs.

With regard to the disputes about royalty calculations (inclusion of featherweight cylinder and SSA's status), the Court finds that taken individually, Figgie's positions were plausible, although minimally so. Taken in context and in consideration of some of the arguments Figgie offered in support of those positions, however, the Court finds that fee shifting is proper for work done on these issues as well.

The Court predicates its finding not only on the closeness of the case, but also on Figgie's conduct in general and approach to the case. In this respect, the Court highlights Figgie's recalcitrance in implementing the settlement agreement, particularly with regard to Figgie's stonewalling of the audit, and its apparent intention to settle the original patent infringement case and then scuttle the settlement, as evidenced by its plans to develop the E–Z Flo while negotiations for the settlement agreement were underway, and its subsequent sale of the E–Z Flo without paying royalties. Even ignoring the E–Z Flo issue, Figgie scorned the settlement agreement from the first by failing to pay its full share of royalties based on sales of the Featherweight Cylinder and sales from SSA.

In finding Figgie liable for attorneys' fees, the Court recognizes its obligation to enforce settlement agreements and foster the repose of settled litigation, especially in patent cases. See Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir.1976); New Castle County v. U.S. Fire Insurance Company, 728 F.Supp. 318, 320 (D.Del.1989). Moreover, the Court's decision would be no

different under federal common law, which recognizes that refusal to abide by the terms of a settlement agreement can constitute bad faith, entitling the wronged party to attorneys' fees. *See Hobbs & Co., Inc. v. American Investors Management, Inc.,* 576 F.2d 29, 35–36 & n. 18 (3d Cir.1978). This case does not appreciably differ from the analogous case of *Interdynamics, Inc. v. Firma Wolf,* 653 F.2d 93, 98 (3d Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), in which a defendant was held in contempt for attempting to avoid obligations under a Consent Degree settling patent litigation by introducing a slightly modified product, deeming it a new product, and thus requiring relitigation of the issues resolved under the Consent Decree. *See also KSM Fastening Systems, Inc. v. H.A. Jones Company, Inc.,* 776 F.2d 1522, 1528–29 (Fed.Cir. 1985) (party may be held in contempt if modified product infringes and is only "colorably different" from the product admitted or adjudged infringed; moreover, "with a consent decree, an adjudged device ... is an admitted infringement, and the claims of the patent may be construed in light of that admission when the court undertakes to determine whether a modified device is also an infringement in contempt proceedings.").

See also, 805 F.Supp. 355.

The Court will issue an Order in accordance with this Opinion and scheduling further proceedings in this matter.